

## IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. *95-560* |
| v. | : | DATE FILED: |
| HITHAM ABUHOURAN, a/k/a "Steve Houran" | : | VIOLATIONS: 18 U.S.C. § 225 (Conducting a continuing financial crimes enterprise -- 1 count) |
| SETH T. GARDNER | : | 18 U.S.C. § 371 (Conspiracy -- 2 counts) |
| ADHAM ABUHOURAN, a/k/a "Adam Houran" | : | 18 U.S.C. § 656 (Misapplication of bank funds -- 16 counts) |
| AKTHAM ABUHOURAN, a/k/a "Tony Houran" | : | 18 U.S.C. § 982 (Forfeiture -- 1 count) |
| ADMA ABUHOURAN | : | 18 U.S.C. § 1005 (False entries in bank records -- 11 counts) |
| KASSEM ALAOUIE | : | 18 U.S.C. § 1344 (Bank fraud -- 15 counts) |
| KARAM SALIB | : | 18 U.S.C. § 1623 (Perjury -- 5 counts) |
| | : | 18 U.S.C. § 1956 (Money laundering -- 4 counts) |
| | : | 18 U.S.C. § 2314 (Interstate transportation of property obtained by fraud -- 2 counts) |
| | : | 18 U.S.C. § 2 (Aiding and abetting) |

**FILED**

OCT 3 1995

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

## I N D I C T M E N T

<u>COUNT ONE</u>

(Bank Fraud -- Hitham Abuhouran Line of Credit)

THE GRAND JURY CHARGES THAT:

1.  At all times relevant to this Indictment:

a.  The Bank of the Brandywine Valley (the "Bank") was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.  Its office was located at 102 East Market Street, West Chester, Pennsylvania.

b.  Defendant SETH T. GARDNER was the President of the Bank.  In this capacity, he assisted in the organization of the Bank, which opened its doors on August 1, 1988.  He drafted the policies of the Bank, including its loan policy.  He also acted as the chief lending officer of the Bank, in which capacity he reviewed and approved loans to others.  GARDNER was personally responsible for the Bank's relationship with defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and persons and entities affiliated with ABUHOURAN, and personally approved all loans and other extensions of credit made by the Bank to ABUHOURAN and his affiliates.

c.  Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" resided at 338 Orangeburgh Road, Old Tappan, New Jersey, and was the owner of Houran Construction Company ("HCC").  HCC, located at 517-519 7th Street, Union City, New Jersey, was a construction firm which primarily engaged in projects for public agencies in the State of New Jersey.  ABUHOURAN also controlled a number of other companies, which performed services for HCC or

- 2 -

were merely shell companies.  All of these companies were also
located at 517-519 7th Street, Union City, New Jersey.  ABUHOURAN
also controlled Houran Trading Company, which attempted to engage
in international sales of goods.

d.  Defendant ADHAM ABUHOURAN, a/k/a "Adam
Houran," the brother of defendant HITHAM ABUHOURAN, a/k/a "Steve
Houran," was also employed by HCC.  He also resided at 338
Orangeburgh Road, Old Tappan, New Jersey, until December 1991,
when he moved to 31 Wildwood Road, Saddle River, New Jersey.

e.  Defendant AKTHAM ABUHOURAN, a/k/a "Tony
Houran," the brother of defendants HITHAM ABUHOURAN, a/k/a "Steve
Houran" and ADHAM ABUHOURAN, a/k/a "Adam Houran," also resided at
338 Orangeburgh Road, Old Tappan, New Jersey and was employed by
HCC.

f.  Defendant ADMA ABUHOURAN, the sister of
defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM
ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony
Houran," also resided at 338 Orangeburgh Road, Old Tappan, New
Jersey.

g.  Defendant KASSEM ALAOUIE was an employee of
defendant HITHAM ABUHOURAN, a/k/a "Steve Houran."

h.  Defendant KARAM SALIB was a bookkeeper who
performed bookkeeping services for HCC and its related companies.

i.  Between May 1990 and October 1991, defendants
HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a
"Adam Houran," AKTHAM ABUHOURAN, a/k/a "Tony Houran," and ADMA

- 3 -

ABUHOURAN, and persons and entities controlled by them obtained over $9 million in loans and other extensions of credit from the Bank. They did not repay these funds, causing the insolvency of the Bank, which was placed in receivership by the Commonwealth of Pennsylvania on February 21, 1992.

2.  From in or about April 1990, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

KARAM SALIB

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.  It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained a line of credit from the Bank for his personal use, in the amount of $426,000, by misrepresenting to the Bank his personal finances. Specifically, HITHAM ABUHOURAN, a/k/a "Steve Houran," in part, did the following:

a.  He submitted personal financial statements to the Bank, representing that his net worth as of December 31, 1989 was $15,130,831 and that his net worth as of June 1, 1990 was $13,661,704. These statements appeared on the forged letterhead

- 4 -

of an accountant, who did not in fact prepare the statements. Further, the representations on the statements were false; in truth, as the defendant knew, his net worth at these times was far less and possibly as little as zero. For instance, the June 1, 1990 financial statement included the following misrepresentations, among others:

    (1)   That the defendant had "cash on hand and in banks" in the amount of $875,000.

    (2)   That the defendant owned a property located at 338 Orangeburgh Road in Old Tappan, New Jersey, with a value of $2 million.

    (3)   That the defendant owned a property located at 903-905 New York Avenue in Union City, New Jersey, with a value of $3,100,000.

    (4)   That the defendant owned three condominiums located at 816 Palisade Avenue in Union City, New Jersey, with a value of $600,000.

    (5)   That the defendant owned a property located at 520 7th Street in Union City, New Jersey, with a value of $350,000.

    (6)   That the defendant owned a property located at 4700-4704 Tonnelle Avenue in North Bergen, New Jersey, with a value of $400,000.

    (7)   That the defendant owned a property located at 119-121 42nd Street in Union City, New Jersey, with a value of $560,000.

(8)   That the defendant owned a property located at 4712 Tonnelle Avenue in North Bergen, New Jersey, with a value of $400,000.

(9)   That the defendant owned a property located at 372 Communipaw Avenue in Jersey City, New Jersey, with a value of $700,000.

(10)   That the defendant owned a property located at 73-75 Pamrapo Avenue in Jersey City, New Jersey, with a value of $290,000.

(11)   That the defendant owned 150 acres of land located in San Diego, with a value of $2,750,000.

In truth, the defendant either did not own these assets or the assets were worth substantially less than the amounts provided.  The financial statement also understated the debts owed by the defendant at the time.

b.  Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" submitted to the Bank in support of his application for the line of credit documents which he purported to be his personal tax returns for the years 1987, 1988, and 1989.  These documents, prepared by defendant KARAM SALIB, purported that ABUHOURAN's adjusted gross income in those years was $329,746, $494,165, and $515,849, respectively.  In fact, these documents were not the returns filed by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" with the Internal Revenue Service for the years in question.  The actual tax returns filed with the IRS, which ABUHOURAN never provided to the Bank, reported adjusted gross

- 6 -

income of $15,240, ($7,393), and $3,033, for the years 1987, 1988, and 1989, respectively.

        c.  In contrast to the financial status depicted by the false documents provided by the defendant to the Bank, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" was not financially capable to carry this line of credit.

        In violation of Title 18, United States Code, Sections 1344 and 2.

- 7 -

<u>COUNT TWO</u>

(Misapplication -- Hitham Abuhouran Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   Between on or about August 17, 1990 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving increases to the line of credit of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" at the Bank, thereby increasing that line from $250,000 to $426,000, and by disbursing those funds.

3.   This conduct represented misapplication of funds for the following reasons, among others:

a.   The funds extended to ABUHOURAN by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of other officers and directors of the Bank.

b.   On three occasions, GARDNER placed false documents in the loan file, stating that members of the board of

- 8 -

directors had approved extensions of this line of credit, when that was in fact not true.

       c.   GARDNER did not obtain any security for the loan other than the borrower's personal guarantee.

       d.   The funds provided to ABUHOURAN, when combined with other monies owed by him to the Bank or whose repayment he had guaranteed, exceeded the amount the Bank was permitted by law to lend to a single borrower.

       e.   GARDNER failed to conduct any inquiry regarding the financial information provided by ABUHOURAN in support of the request for a loan, and therefore did not discover that material information submitted by ABUHOURAN was false.

       f.   Although the extension to ABUHOURAN was fashioned a line of credit, GARDNER permitted the borrower to draw the total sum approved, and never required any principal payments.  Despite the fact that the line was fully extended, GARDNER never converted the credit to a term loan with a fixed schedule of repayment of principal.

       In violation of Title 18, United States Code, Section 656.

## COUNT THREE

(Bank Fraud -- Houran Construction Co. Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 and 3 of Count One of this Indictment are incorporated here by reference.

2. From in or about April 1990, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendant

**HITHAM ABUHOURAN,**
a/k/a "Steve Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3. It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained a line of credit from the Bank for the use of his wholly owned corporation, Houran Construction Company ("HCC"), in the amount of $540,000, by misrepresenting to the Bank his personal finances and that of HCC. Specifically, the defendant, in part, did the following:

a. He signed a personal guarantee of the line of credit, while misrepresenting his personal finances, as set forth in paragraph 3 of Count One of this Indictment.

- 10 -

b.   He submitted to the Bank documents which purported to be audited financial statements of HCC, for the periods ending July 31, 1987, July 31, 1988, and July 31, 1989. These allegedly audited statements appeared on the letterhead of "Louis Croussillat, Certified Public Accountant."  In fact, as the defendant knew, these statements were wholly fictitious, were not audited by a certified public accountant, and were not prepared by Luis Crousillat.  Crousillat, whose name is spelled differently from the name which appears on the forged stationery provided by the defendant to the Bank, did not provide any auditing services for the defendant or HCC.

c.   Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" submitted to the Bank in support of his application for the HCC line of credit documents which he purported to be HCC's corporate tax returns for the fiscal years 1986, 1987, 1988, and 1989.  In fact, these documents were not the returns filed by HCC with the Internal Revenue Service for the years in question.  The actual tax returns filed with the IRS, which the defendant never provided to the Bank, reported receipts and income far lower than the amounts stated on the fraudulent returns provided to the Bank.  For example, the document provided to the Bank which purported to be HCC's 1989 return claimed gross receipts of $4,886,484, and taxable income of $1,252,994; the actual return filed with the IRS for that year claimed gross receipts of $1,457,399.49 and taxable income of ($187,424.97).

d.   In contrast to the financial status depicted by the false documents provided by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" to the Bank, HCC was in fact at all times in poor financial condition, a fact which the defendant never disclosed to the Bank, and was unable to repay the funds borrowed.

e.   Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" provided security for the HCC line of credit, in the form of a mortgage on HCC's office building located at 517-519 7th Street, Union City, New Jersey.   The defendant falsely represented to the Bank that this property was worth $950,000 as of May 7, 1990, when in fact the defendant knew that the property was worth substantially less at that time.

In violation of Title 18, United States Code, Sections 1344 and 2.

<u>COUNT FOUR</u>

(Misapplication -- Houran Construction Co. Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  Between in or about December 1990 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the increase of a line of credit to Houran Construction Company ("HCC") from $250,000 to a total amount of $540,000, and by disbursing most of that total.

3.  This conduct represented misapplication of funds for the following reasons, among others:

a.  The funds extended to HCC by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of other officers and directors of the Bank.

b.  On three occasions, GARDNER placed false documents in the HCC loan file, stating that members of the board of directors had approved extensions of this line of credit, when that was in fact not true.

- 13 -

c.   The funds provided to HCC, when combined with other monies owed to the Bank by parties closely associated with HCC, exceeded the amount the Bank was permitted by law to lend to a single borrower.

d.   GARDNER failed to conduct any inquiry regarding the financial information provided by the borrower in support of the request for a loan, and therefore did not discover that material information submitted by the borrower was false and that the true facts would not have supported the decision to make a loan.

e.   In violation of the policies adopted by the board of directors, GARDNER accepted an appraisal supplied by HCC regarding the property offered as collateral for the loan (at 517-519 7th Street, Union City, New Jersey), consisting of a single-page letter from a realtor, and did not obtain an independent appraisal.  He further made no inquiry into the accuracy of the supplied appraisal or the qualifications of its author, and therefore did not learn that the appraisal he received was fraudulent.

f.   While the appraisal was fraudulent, even the value stated in that document -- $950,000 -- was ultimately less than the total of prior liens on the property and the line of credit approved by GARDNER.  However, GARDNER did not obtain any additional security for the loan.  Further, in or about February 1991 GARDNER received notice that the prior lienholder was attempting to foreclose on the property, which would eliminate

- 14 -

the Bank's security interest.  Even then, GARDNER did not obtain
any additional security or demand repayment of the HCC line of
credit.

        g.  Although the extension to HCC was fashioned a
line of credit, GARDNER permitted the borrower to draw the total
sum approved, and never required any principal payments.  Despite
the fact that the line was fully extended, GARDNER never
converted the credit to a term loan with a fixed schedule of
repayment of principal.

        In violation of Title 18, United States Code, Section
656.

## COUNT FIVE

(Bank Fraud -- Houran Trading Co. Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  From in or about July 1990, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

AKTHAM ABUHOURAN,
a/k/a "Tony Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.  It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran" obtained a line of credit from the Bank for the use of Houran Trading Company ("HTC"), in the amount of $350,000, by misrepresenting to the Bank their personal finances and that of HTC, and by misrepresenting the purpose of the loan. Specifically, the defendants, in part, did the following:

- 16 -

a.   They represented that the loan proceeds would by used to support the business of HTC, which purportedly engaged in international business transactions, including the purchase and sale of shoes.  In fact, as the defendants knew and intended, the funds were to be used for the personal needs of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and for the affairs of Houran Construction Company, both of whom were already indebted to the Bank for substantial sums and could not legally borrow additional money from the Bank.

b.   Defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" signed a personal guarantee of the line of credit, while misrepresenting his personal finances.  He and defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" submitted a personal financial statement to the Bank, representing that the net worth of AKTHAM ABUHOURAN, a/k/a "Tony Houran" as of June 1, 1990 was $2,263,922. This representation was false; in truth, as the defendants knew, his net worth was far less.  Further, the personal financial statement appeared on the forged letterhead of an accountant, who did not in fact prepare the statement.  The statement included the following misrepresentations, among others:

(1)   That defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" had "cash on hand and in banks" in the amount of $377,000.

(2)   That the defendant owned HTC, which had a value of $745,922.

- 17 -

(3)   That the defendant owned a property located at 2031 46th Street in North Bergen, New Jersey with a value of $347,000.

(4)   That the defendant owned a property located at 227 Martin Luther King in Jersey City, New Jersey with a value of $465,000.

(5)   That the defendant owned a property located at 1604 74th Street in North Bergen, New Jersey with a value of $570,000.

In truth, the defendant either did not own these assets or the assets were worth substantially less than the values stated.

c.   The defendants submitted to the Bank a document which purported to be an audited financial statement of HTC, for the period ending December 31, 1989.  This allegedly audited statement appeared on the letterhead of "Louis Croussillat, Certified Public Accountant."  In fact, as the defendants knew, this statement was wholly fictitious, was not audited by a certified public accountant, and was not prepared by Luis Crousillat.  Crousillat, whose name is spelled differently from the name which appears on the forged stationery provided by the defendants to the Bank, did not provide any auditing services for the defendants or HTC.

d.   The defendants submitted to the Bank in support of their application for the HTC line of credit a document which they purported to be HTC's corporate tax return

for the fiscal year 1990.  In fact, this document was not the return filed by HTC with the Internal Revenue Service for the year in question, and overstated the success of HTC's business. The document provided to the Bank claimed gross receipts of $798,453 and taxable income of $169,161; the actual return filed with the IRS claimed gross receipts of $69,057 and taxable income of ($497,505).

   e. In contrast to the financial status depicted by the false documents provided by the defendants to the Bank, HTC did little actual business and was not financially capable to carry the line of credit.

   In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT SIX

(Misapplication -- Houran Trading Co. Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   Between on or about July 3, 1990 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the extension of a line of credit to Houran Trading Company ("HTC"), in a total amount of $350,000, and disbursing those funds.

3.   This conduct represented misapplication of funds for the following reasons, among others:

a.   The funds extended to HTC by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of other officers and directors of the Bank.

b.   GARDNER placed a false document in the HTC loan file, stating that members of the board of directors had approved a portion of this line of credit, when that was in fact not true.

- 20 -

c.  The funds extended to HTC were approved by GARDNER to finance its accounts receivable, which were allegedly derived from international trade.  However, the majority of the funds was in fact used for the personal purposes of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and for the activities of Houran Construction Company.  GARDNER aided this diversion of funds by following ABUHOURAN's instructions to deposit monies credited to the HTC loan to the depository accounts of ABUHOURAN and Houran Construction Company at the Bank.

d.  The funds provided to HTC, when combined with other monies owed to the Bank by parties closely associated with HTC, exceeded the amount the Bank was permitted by law to lend to a single borrower.

e.  GARDNER failed to conduct any inquiry regarding the financial information provided by the borrower in support of the request for a loan, and therefore did not discover that material information submitted by the borrower was false and that the true facts would not have supported the decision to make a loan.  Further, GARDNER did not obtain any information at all regarding the accounts receivable which allegedly secured the loan.

f.  Although the extension to HTC was fashioned a line of credit, GARDNER permitted the borrower to draw the total sum approved, and never required any principal payments.  Despite the fact that the line was fully extended, GARDNER never

- 21 -

converted the credit to a term loan with a fixed schedule of repayment of principal.

In violation of Title 18, United States Code, Section 656.

## COUNT SEVEN

(Bank Fraud -- Adham Abuhouran and Nasser Plaza Lines of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

      1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

      2.   From in or about February 1991, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran," and

KARAM SALIB

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

      3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and ADHAM ABUHOURAN, a/k/a "Adam Houran" obtained a line of credit from the Bank for the use of ADHAM ABUHOURAN, a/k/a "Adam Houran," in the amount of $250,000, and a related loan to Nasser Plaza, Inc., in the amount of $350,000, by misrepresenting to the Bank their personal finances and that of

Nasser Plaza, Inc., and by misrepresenting other material facts. Specifically, these defendants, in part, did the following:

a.   The defendants controlled Nasser Plaza, Inc., a fictitious entity which had no business operations.  They borrowed a total of $600,000, taking a portion of the funds in the name of Nasser Plaza, Inc. and the remainder in the name of ADHAM ABUHOURAN.  The defendants structured the loans in this manner to aid the Bank's president in making the loans even though the loans violated the Bank's legal lending limit on loans to one borrower.

b.   In taking the loans, the defendants represented that these funds were required for the purchase of a property located at 5601-23 Kennedy Blvd., North Bergen, New Jersey, and offered that property as security for the loans. Toward this end, they provided to the Bank a forged and fictitious appraisal of the property, representing a value of $1,218,600 as of November 13, 1990.  They also provided a fictitious contract, which represented that Nasser Plaza, Inc. had agreed to buy the property for $895,000.  In fact, as the defendants knew, they purchased the property for only $460,000, and they diverted the excess loan proceeds to their personal use.

c.   Defendant ADHAM ABUHOURAN, a/k/a "Adam Houran," in obtaining the loan in his name, misrepresented his personal finances, when he and defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" submitted a personal financial statement to the Bank representing that the net worth of ADHAM ABUHOURAN, a/k/a

- 24 -

"Adam Houran" as of November 1, 1990 was $2,896,400.  This
representation was false; in truth, as the defendants knew, ADHAM
ABUHOURAN's net worth was far less.  The statement included the
following misrepresentations, among others:

       (1)  That defendant ADHAM ABUHOURAN, a/k/a
"Adam Houran" had "cash on hand in banks" in the amount of
$276,000.

       (2)  That the defendant held life insurance
with a cash value of $46,000.

       (3)  That the defendant held a note in the
amount of $126,000, on which he received monthly interest of
$1,236.

       (4)  That the defendant owned a company named
Bally Construction, with a value of $1.2 million.

       (5)  That the defendant owned a company named
Sahouran Realty, with a value of $460,000.

       (6)  That the defendant owned a property
located at 408 Henry Street, Fairview, New Jersey, with a value
of $425,000.

       (7)  That the defendant owned a property
located at 6313 Broadway, West New York, New Jersey, with a value
of $400,000.

       (8)  That the defendant owned a property
located at 167 Monticello, Jersey City, New Jersey, with a value
of $200,000.

(9)   That the defendant owned a property located at 4708 Tonnelle Avenue, North Bergen, New Jersey, with a value of $200,000.

(10)   That the defendant owned a second home in Florida, located at 1604 21 Blvd., Fort Lauderdale, Florida, with a value of $225,000.

In truth, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" either did not own these assets or the assets were worth substantially less than the amounts provided.

d.   The defendants submitted to the Bank in support of the application of ADHAM ABUHOURAN, a/k/a "Adam Houran" documents which they purported to be his personal tax returns for the years 1988 and 1989.  In fact, these documents, which were prepared by defendant KARAM SALIB, were not the returns filed by defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" with the Internal Revenue Service for the years in question, and overstated his income for those years.  For example, the fictitious 1989 tax return purported that ADHAM ABUHOURAN's adjusted gross income in that year was $152,585; the actual return submitted to the IRS for that year reported adjusted gross income of $8,340.

e.   In contrast to the financial status depicted by the false documents provided by the defendants to the Bank, ADHAM ABUHOURAN, a/k/a "Adam Houran" and Nasser Plaza, Inc. were in fact not financially capable to carry the loans.

- 26 -

f.  To accomplish the purpose of the scheme, which was to obtain funds of the Bank and apply them to the personal use of the defendants and companies they controlled, defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and ADHAM ABUHOURAN, a/k/a "Adam Houran" engaged in a series of financial transactions between on or about December 4, 1990 and on or about February 20, 1991 to divert the funds from the recipients of the loans.  These transactions included the following:

(1)  On or about December 4, 1990, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" received a check written on the account of Raymond E. Murphy, Jr. Attorney Trust Account, number 106105572 at First Fidelity Bank, Jersey City, New Jersey, in the amount of $175,286.10, and deposited it in the account of Adham and Manal Abuhouran, number 8221204434 at First Fidelity, Union City, New Jersey.  This check represented the excess proceeds of the $600,000 in loans made to Nasser Plaza, Inc. and ADHAM ABUHOURAN, as described in subparagraph (a) above.

(2)  ADHAM ABUHOURAN, a/k/a "Adam Houran" then wrote the following checks on the First Fidelity account in his name:

(i)  Number 1007, dated December 6, 1990, in the amount of $100,000, payable to Houran Const. Inc. This check was deposited in the account of Houran Construction Company at the Bank of the Brandywine Valley (the "Bank"), number 5002555.

(ii)   Number 1026, dated January 21, 1991, in the amount of $60,000, payable to Adham J. Abuhouran. This check was deposited in the account of Nasser Plaza, Inc. at the Bank, number 5003348.

(3)   ADHAM ABUHOURAN, a/k/a "Adam Houran" then wrote the following checks on the Nasser Plaza account, all of which were payable to 2427 Lemoine Ave. Liquor and were deposited in the account of that firm (which was controlled by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran") at Hudson United Bank, Union City, New Jersey:

(i)   A check dated January 29, 1991, for $20,000.

(ii)   A check dated February 7, 1991, for $10,000.

(iii)   A check dated February 12, 1991, for $2,734.

(iv)   A check dated February 13, 1991, for $12,900.

(v)   A check dated February 20, 1991, for $5,000.

In violation of Title 18, United States Code, Sections 1344 and 2.

<u>COUNT EIGHT</u>

(Money Laundering -- Adham Abuhouran
and Nasser Plaza Lines of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment, and
paragraph 3 of Count Seven of this Indictment, are incorporated
here by reference.

2.  On or about December 6, 1990, in the Eastern
District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

ADHAM ABUHOURAN,
a/k/a "Adam Houran"

knowingly conducted and did knowingly aid, abet, and cause the
conducting of the following financial transaction affecting
interstate commerce:  Defendant ADHAM ABUHOURAN, a/k/a "Adam
Houran" wrote a check, number 1007, on the account of Adham and
Manal Abuhouran, number 8221204434, at First Fidelity Bank, Union
City, New Jersey, payable to "Houran Const. Inc.," in the amount
of $100,000, which was deposited by the defendants in the account
of Houran Construction Company at the Bank of the Brandywine
Valley, number 5002555.

3.  When conducting and aiding, abetting, and causing
the conducting of this financial transaction, the defendants knew
that the property involved in the financial transaction
represented the proceeds of some form of unlawful activity.

4.  The financial transaction described in paragraph 2
involved the proceeds of a specified unlawful activity, that is,

- 29 -

bank fraud, as charged in Count Seven of this Indictment, and the defendants acted with the intent to promote the carrying on of the specified unlawful activity.

In violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

<u>COUNT NINE</u>

(Misapplication -- Adham Abuhouran and
Nasser Plaza Lines of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is
incorporated here by reference.

2.  Between on or about November 21, 1990 and on or
about December 10, 1991, at West Chester, in the Eastern District
of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the
Brandywine Valley, misapplied funds and monies of the Bank, and
funds and monies entrusted to the custody or care of the Bank, by
approving a loan to Adham and Manal Abuhouran, in the amount of
$250,000, and a related loan to Nasser Plaza, Inc., in the amount
of $350,000, and disbursing those funds.

3.  This conduct represented misapplication of funds
for the following reasons, among others:

a.  GARDNER knew that the two loans were made for
a single purpose, the acquisition by defendant HITHAM ABUHOURAN,
a/k/a "Steve Houran" and persons associated with him of a single
property located at 5601-5623 Kennedy Blvd., North Bergen, New
Jersey.  However, the total amount loaned, in the amount of
$600,000, exceeded the limit imposed on the Bank by state law for
a loan to one borrower, so GARDNER divided the loan into two
loans in order to hide the illegal nature of the loan from the

- 31 -

officers and directors of the Bank and from government regulators
and examiners.

b.  With respect to the Nasser Plaza loan, GARDNER
placed a false document in the loan file, stating that members of
the board of directors had approved the loan, when that was in
fact not true.

c.  The funds provided to Nasser Plaza and to
Adham and Manal Abuhouran, when combined with other monies owed
to the Bank by parties closely associated with them, exceeded the
amount the Bank was permitted by law to lend to a single
borrower.

d.  Besides the borrowers' agreement to repay the
loans, GARDNER obtained only the personal guarantee of defendant
HITHAM ABUHOURAN, a/k/a "Steve Houran," who at the time already
owed substantial sums to the Bank.

e.  GARDNER failed to conduct any inquiry
regarding the financial information provided by the borrowers in
support of the request for the loans, and therefore did not
discover that material information submitted by the borrowers was
false and that the true facts would not have supported the
decision to make the loans.

f.  Although the loans were made to finance the
acquisition of a piece of property, GARDNER did not obtain
documents in advance of disbursing the loans evidencing the means
by which the borrowers obtained title to the property, which
would have established that the borrowers had fraudulently

- 32 -

represented to the Bank the true purchase price of the property and that the Bank was in fact providing $140,000 more than it cost the buyers to acquire the property. Further, after the loans were extended, GARDNER in fact learned that the Bank's loans had exceeded by $140,000 the purchase price of the property, but he made no effort to recover those funds or otherwise alter the loans.

g. In violation of the policies adopted by the board of directors, GARDNER accepted an appraisal supplied by the borrowers regarding the property offered as collateral for the loans, and did not obtain an independent appraisal. He further made no inquiry into the accuracy of the supplied appraisal or the qualifications of its author, and therefore did not learn that the appraisal he received was fraudulent.

h. Although the extension to Adham and Manal Abuhouran was fashioned a line of credit, GARDNER permitted the borrower to immediately draw the total sum approved, and never required any principal payments. Despite the fact that the line was fully extended, GARDNER never converted the credit to a term loan with a fixed schedule of repayment of principal.

i. GARDNER made the loan to Adham and Manal Abuhouran even though the signatures of Adham Abuhouran on different loan documents did not match each other.

In violation of Title 18, United States Code, Section 656.

- 33 -

<u>COUNT TEN</u>

(Bank Fraud -- Safe Home Construction Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  From in or about October 1990, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendant

HITHAM ABUHOURAN,
a/k/a "Steve Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.  It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained a line of credit from the Bank for the use of Safe Home Construction, Inc. ("Safe Home"), in the amount of $250,000, by misrepresenting to the Bank his personal finances and that of Safe Home, and by misrepresenting the purpose of the loan.  Specifically, the defendant, in part, did the following:

a.  He represented that the loan proceeds would be used to support the business of Safe Home, which purportedly engaged in construction projects.  To support this claim, he

- 34 -

submitted a fictitious contract to the Bank which purported that Safe Home had been hired as a construction contractor at a mall in Jersey City, New Jersey.  In fact, as the defendant knew, the contract was a forgery, and Safe Home had no business affairs of any kind.  In truth, the loan funds were to be used for the personal needs of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," and for the affairs of Houran Construction Company and other entities he controlled, all of whom were already indebted to the Bank for substantial sums and could not legally borrow additional money from the Bank.

b.   Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" signed a personal guarantee of the line of credit, while misrepresenting his personal finances, as set forth in paragraph 3 of Count One of this Indictment.

c.   To support an extension of the line of credit, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" submitted to the Bank a document which purported to be a financial statement of Safe Home, for the period ending February 28, 1991.  In fact, as the defendant knew, this statement was wholly fictitious.

In violation of Title 18, United States Code, Sections 1344 and 2.

- 35 -

<u>COUNT ELEVEN</u>

(Misapplication -- Safe Home Construction Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   Between on or about October 30, 1990 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the extension of a line of credit to Safe Home Construction, Inc. ("Safe Home"), in a total amount of $250,000, and disbursing those funds.

3.   This conduct represented misapplication of funds for the following reasons, among others:

a.   The funds extended to Safe Home by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of the chairman of the Bank.

b.   GARDNER obtained insufficient security for the loan, consisting only of the personal guarantee of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," who at the time was personally indebted to the Bank for over $300,000 and had

- 36 -

guaranteed over $700,000 in other loans; and a security interest in Safe Home's accounts receivable.  However, GARDNER received no information at all regarding those alleged accounts receivable, which were in fact nonexistent.

c.  The funds were provided to Safe Home even though GARDNER received no information, such as financial statements and tax returns, regarding the borrower's financial means.  This conduct violated the loan policy adopted by the Bank's board of directors.  The only document GARDNER received in support of the loan was an item which purported to be a contract between Safe Home and Melville, Inc. for construction work at a mall in Jersey City, New Jersey.  GARDNER never made any inquiry regarding the truthfulness of this document, and therefore did not learn that the document was a forgery and that no such contract existed.

d.  Further, GARDNER did not receive any documents regarding the corporate status of Safe Home, such as articles of incorporation and an authorization by the corporation's board for the loan.  In fact, Safe Home had never been incorporated and could not produce such documents.

e.  The funds provided to Safe Home, when combined with other monies owed to the Bank by the true beneficiary of the loan, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," and parties closely associated with him, exceeded the amount the Bank was permitted by law to lend to a single borrower.

f.   The loan was made to a new company, which had no business experience.  Such an extension of credit, without adequate security, violated the policies adopted by the Bank's board of directors.

g.   Although the extension to Safe Home was fashioned a line of credit, GARDNER permitted Safe Home to draw the total sum approved, and never required any principal payments.  Despite the fact that the line was fully extended, GARDNER never converted the credit to a term loan with a fixed schedule of repayment of principal.

In violation of Title 18, United States Code, Section 656.

## COUNT TWELVE

### (Bank Fraud -- Summit Avenue and Gray Loans)

THE GRAND JURY FURTHER CHARGES THAT:

1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

2.   From in or about December 1990, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendant

HITHAM ABUHOURAN,
a/k/a "Steve Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained a loan from the Bank in the name of 415-435 Summit Avenue Corporation, in the amount of $325,000, and he obtained a related loan in the name of Frederic Gray, in the amount of $325,000, by misrepresenting to the Bank material facts regarding these loans.  Specifically, the defendant, in part, did the following:

a.   In borrowing a total of $650,000, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" represented that these funds were required for the purchase of a property located at

- 39 -

415-435 Summit Avenue, Jersey City, New Jersey, and offered that property as security for the two loans.  In fact, as the defendant knew, he purchased the property for only $599,000, and he diverted the excess loan proceeds to his personal use and the use of companies he controlled.

b.  The defendant further misrepresented to the Bank that he had entered a contract to resell the property for $900,000, thereby assuring the Bank that the loans were justified and would promptly be repaid.  That contract had never been entered.

c.  Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" personally guaranteed repayment of the loan to 415-435 Summit Avenue Corporation, as did his wholly owned company, Houran Construction Company ("HCC").  In so doing, he misrepresented his personal finances, as set forth in paragraph 3 of Count One of this Indictment, and misrepresented the finances of HCC, as set forth in paragraph 3 of Count Three of this Indictment.

In violation of Title 18, United States Code, Sections 1344 and 2.

<u>COUNT THIRTEEN</u>

(Misapplication -- Summit Avenue and Gray Loans)

THE GRAND JURY FURTHER CHARGES THAT:

1.    Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.    Between on or about December 20, 1990 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving a loan to 415-435 Summit Avenue Corporation ("Summit Avenue"), in the amount of $325,000, and a related loan to Frederic Gray, in the amount of $325,000, and disbursing those funds.

3.    This conduct represented misapplication of funds for the following reasons, among others:

a.    The two loans were made for a single purpose, as GARDNER knew -- the acquisition by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" of a single property located at 415-435 Summit Avenue, Jersey City, New Jersey.  However, the total amount loaned, in the amount of $650,000, exceeded the limit imposed on the Bank by state law for a loan to one borrower, so GARDNER divided the loan into two loans in order to hide the

- 41 -

illegal nature of the loan from the officers and directors of the Bank and from government regulators and examiners.

b.   GARDNER placed a false document in the Summit Avenue loan file, stating that members of the board of directors had approved that loan, when that was in fact not true.

c.   The funds provided to Summit Avenue and Gray, when combined with other monies owed to the Bank by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and parties closely associated with him, exceeded the amount the Bank was permitted by law to lend to a single borrower.

d.   Although GARDNER knew that the true purchase price of the property was $600,000, he loaned over 100% of this amount to the borrowers.

e.   In violation of the policies adopted by the board of directors, GARDNER accepted an appraisal supplied by ABUHOURAN regarding the property offered as collateral for the loans, and did not obtain an independent and current appraisal. The appraisal he accepted was two years old, and relied on fraudulent information.

f.   The loans as approved were payable in six months, in which time ABUHOURAN represented he would resell the property.  But when that time passed, and no resale took place, GARDNER simply extended the notes indefinitely, without consulting with any other officers or directors of the Bank.

In violation of Title 18, United States Code, Section 656.

- 42 -

COUNT FOURTEEN

(Bank Fraud -- 2427 Lemoine Avenue Liquors Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

    1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

    2.   From in or about October 1990, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendant

HITHAM ABUHOURAN,
a/k/a "Steve Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

    3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained a line of credit from the Bank for the use of 2427 Lemoine Avenue Liquors ("Lemoine"), in the amount of $200,000, by misrepresenting to the Bank the finances of Lemoine, and by misrepresenting the purpose of the loan. Specifically, the defendant, in part, did the following:

    a.   He represented that the loan proceeds would be used to support the business of Lemoine, which operated a liquor store in Fort Lee, New Jersey.  In fact, as the defendant knew and intended, the funds were to be used for his personal needs

- 43 -

and for the affairs of Houran Construction Company, both of whom were already indebted to the Bank for substantial sums and could not legally borrow additional money from the Bank.

b.   The defendant submitted to the Bank documents which purported to be financial statements of Lemoine, for the periods ending October 30, 1990 and June 28, 1991.  Both of these statements were fictitious, and claimed business success far beyond that enjoyed by Lemoine.  Further, the October 30, 1990 statement appeared on the letterhead of "Louis Croussillat, Certified Public Accountant."  In fact, as the defendant knew, this statement was not prepared by Luis Crousillat.  Crousillat, whose name is spelled differently from the name which appears on the forged stationery provided by the defendant to the Bank, did not prepare any financial statement for Lemoine.

c.   Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" submitted to the Bank in support of the application for the line of credit a document which he purported to be Lemoine's corporate tax return for the year 1990.  In fact, this document was not filed by Lemoine with the Internal Revenue Service for the year in question; in truth, Lemoine did not file any return that year at all.

d.   In contrast to the financial status depicted by the false documents provided by the defendant to the Bank, Lemoine was not financially capable to carry the line of credit.

In violation of Title 18, United States Code, Sections 1344 and 2.

- 44 -

COUNT FIFTEEN

(Misapplication -- 2427 Lemoine Avenue Liquors Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

    1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

    2.  Between on or about October 30, 1990 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the extension of a line of credit to 2427 Lemoine Avenue Liquors ("Lemoine"), in a total amount of $200,000, and disbursing those funds.

    3.  This conduct represented misapplication of funds for the following reasons, among others:

      a.  The funds extended to Lemoine by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of the chairman of the Bank.

      b.  GARDNER did not obtain any security for the loan.  He wrote in the loan file that the line was secured by a liquor store's inventory, furniture, and fixtures, but the Bank never performed any inspection of any of these alleged assets.

- 45 -

c.   The funds extended to Lemoine were approved by GARDNER to be used for working capital in the operation of a liquor store, which was owned by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran."  However, all of the funds were in fact used for the personal purposes of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and for the activities of Houran Construction Company.  GARDNER aided this diversion of funds by following ABUHOURAN's instructions to deposit monies credited to the Lemoine loan to the depository account of Houran Construction Company at the Bank.

d.   The funds provided to Lemoine, when combined with other monies owed to the Bank by parties closely associated with defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," exceeded the amount the Bank was permitted by law to lend to a single borrower.

e.   GARDNER failed to conduct any inquiry regarding the financial information provided by the borrower in support of the request for a loan, and therefore did not discover that material information submitted by the borrower was false and that the true facts would not have supported the decision to make a loan.

f.   Although the extension to Lemoine was fashioned a line of credit, GARDNER permitted the borrower to draw the total sum approved, and never required any principal payments.  Despite the fact that the line was fully extended,

GARDNER never converted the credit to a term loan with a fixed
schedule of repayment of principal.

In violation of Title 18, United States Code, Section
656.

## COUNT SIXTEEN

(Bank Fraud -- Houran Plaza Associates Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

     1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

     2.   From in or about March 1991, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

AKTHAM ABUHOURAN,
a/k/a "Tony Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

     3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran" obtained a line of credit from the Bank for the use of Houran Plaza Associates, in the amount of $350,000, by misrepresenting to the Bank their personal finances and that of Houran Plaza Associates, and by misrepresenting the purpose of the loan. Specifically, the defendants, in part, did the following:

a.  They represented that the loan proceeds would by used to refurbish a building owned by Houran Plaza, located at 903-905 New York Avenue, Union City, New Jersey.  In fact, as the defendants knew, the building had already been refurbished, and the funds were to be used for the personal needs of defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran," and for the affairs of Houran Construction Company and other companies controlled by the defendants, all of whom were already indebted to the Bank for substantial sums and could not legally borrow additional money from the Bank.

b.  The defendants provided security for the Houran Plaza line of credit, in the form of a mortgage on the property located at 903-905 New York Avenue.  Toward this end, they provided a contract to the Bank which stated that they had acquired the property for $1.1 million in May 1988.  They also submitted an appraisal to the Bank which stated that the property was worth $3.1 million as of September 15, 1989.  In truth, as the defendants knew, the May 1988 contract was fictitious, and they had purchased the property at that time for only $730,000. Further, the 1989 appraisal was erroneous, as it was based on extensive false information provided to the appraiser by the defendants regarding the rents paid by tenants of the building. The defendants did not disclose to the Bank that at the time of the Bank's loan the building was in fact worth no more than the total of preexisting mortgages on the property, and therefore did not secure the Bank's loan.

c.   The defendants gave the Bank an assignment of rents from tenants of the building, to secure the line of credit. Toward this end, they provided the bank a rent roll listing the rents allegedly paid by tenants of the building.  This rent roll was fictitious, and overstated the true rents collected from tenants.

d.   To accomplish the purpose of the scheme, which was to obtain funds of the Bank and apply them to the personal use of the defendants and companies they controlled, the defendants engaged in a series of financial transactions between on or about May 6, 1991 and on or about October 2, 1991 to divert the funds from Houran Plaza Associates, the alleged recipient of the loan.  These transactions included the following:

(1)   ADHAM ABUHOURAN, a/k/a "Adam Houran" wrote the following checks on the account of Houran Plaza, Inc. at the Bank of the Brandywine Valley (the "Bank"), number 5003447, payable to Adham J. Abuhouran:

(i)   Check number 1001, dated May 6, 1991, in the amount of $100,000.

(ii)   Check number 1003, dated May 12, 1991, in the amount of $27,000.

(2)   ADHAM ABUHOURAN, a/k/a "Adam Houran" deposited these checks in his account at First Fidelity Bank, Union City, New Jersey, number 8221204434.  He then wrote the following checks on that account:

- 50 -

(i)   Check number 1046, dated June 27, 1991, payable to Adham Abuhouran, in the amount of $55,000.

(ii)   Check number 1044, dated June 28, 1991, payable to Manal Sawaged, in the amount of $25,000.

(iii)   Check number 1045, dated June 30, 1991, payable to Adham Abuhouran, in the amount of $50,000.

(3)   ADHAM ABUHOURAN, a/k/a "Adam Houran" deposited the three First Fidelity checks in an account at National Community Bank, Ridgefield, New Jersey, number 32190073, held in the name of Adham J. and Manal Abuhouran.  From that account, he then wrote these checks, both of which were payable to Houran Const. Co. Inc.:

(i)   Check number 374, dated September 25, 1991, in the amount of $100,000.

(ii)   Check number 382, dated October 2, 1991, in the amount of $50,000.

In violation of Title 18, United States Code, Sections 1344 and 2.

- 51 -

COUNT SEVENTEEN

(Interstate Transportation of Property Obtained
by Fraud -- Houran Plaza Associates Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

On or about April 16, 1991, in the Eastern District of
Pennsylvania, and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

AKTHAM ABUHOURAN,
a/k/a "Tony Houran"

did unlawfully transport and did cause and aid and abet the
transporting in interstate commerce from West Chester,
Pennsylvania to Ridgefield, New Jersey of money which was taken
by fraud, that is, the proceeds of a check written on the account
of Houran Construction Company, Inc. at the Bank of the
Brandywine Valley, West Chester, Pennsylvania, knowing the same
to have been taken by fraud.  The check, number 2128 on account
number 5002555, was dated April 16, 1991, payable to Aktham
Abuhouran, in the amount of $10,000, and signed by HITHAM
ABUHOURAN, a/k/a "Steve Houran."  It was deposited by AKTHAM
ABUHOURAN, a/k/a "Tony Houran" in his account, number 392-5757,
at National Community Bank, Ridgefield, New Jersey.  This check
represented proceeds of the bank fraud described in Count 16 of
this Indictment.

In violation of Title 18, United States Code, Sections
2314 and 2.

<u>COUNT EIGHTEEN</u>

(Money Laundering -- Houran Plaza Associates Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment, and paragraph 3 of Count 16 of this Indictment, are incorporated here by reference.

2.  On or about October 2, 1991, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

ADHAM ABUHOURAN,
a/k/a "Adam Houran"

knowingly conducted and did knowingly aid, abet, and cause the conducting of the following financial transaction affecting interstate commerce:  Defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" wrote a check, number 382, on the account of Adham J. and Manal Abuhouran, number 32190073, at National Community Bank, Ridgefield, New Jersey, payable to "Houran Const. Co. Inc.," in the amount of $50,000, which was deposited by the defendants in the account of Houran Construction Company at First Fidelity Bank, Union City, New Jersey, number 8221401152.

3.  When conducting and aiding, abetting, and causing the conducting of this financial transaction, the defendants knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

4.  The financial transaction described in paragraph 2 involved the proceeds of a specified unlawful activity, that is,

- 53 -

bank fraud, as charged in Count 16 of this Indictment, and the defendants acted with the intent to promote the carrying on of the specified unlawful activity.

In violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

COUNT NINETEEN

(Misapplication -- Houran Plaza Associates Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  Between on or about March 28, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the extension of a line of credit to Houran Plaza Associates, in a total amount of $350,000, and disbursing those funds.

3.  This conduct represented misapplication of funds for the following reasons, among others:

a.  The funds extended to Houran Plaza by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of other officers and directors of the Bank.

b.  GARDNER placed a false document in the Houran Plaza loan file, stating that members of the board of directors had approved this line of credit, when that was in fact not true.

c.   The funds provided to Houran Plaza, when combined with other monies owed to the Bank by parties closely associated with Houran Plaza, exceeded the amount the Bank was permitted by law to lend to a single borrower.

d.   The funds extended to Houran Plaza were approved by GARDNER to be used for the refurbishment of a property located at 903-905 New York Avenue, Union City, New Jersey.  However, the large majority of the funds were in fact used for the personal purposes of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and other companies he controlled.  GARDNER aided this diversion of funds by following ABUHOURAN's instructions to deposit over $210,000 of the monies credited to the Houran Plaza loan to the depository account of Houran Construction Company at the Bank, another $5,000 of the proceeds to the depository account of Houran Trading Company, and another $4,700 to the depository account of ABUHOURAN.

e.   Although the loan was secured by a piece of property, GARDNER violated the policies adopted by the board of directors in accepting an appraisal supplied by the borrower regarding the property, and not obtaining an independent appraisal.  He further made no inquiry into the accuracy of the supplied appraisal, which was over 18 months old at the time GARDNER relied upon it, and therefore did not learn that the appraisal was fraudulent.

f.   Although the extension to Houran Plaza was fashioned a line of credit, GARDNER permitted the borrower to

promptly draw the total sum approved, and never required any principal payments. Despite the fact that the line was fully extended, GARDNER never converted the credit to a term loan with a fixed schedule of repayment of principal.

In violation of Title 18, United States Code, Section 656.

## COUNT TWENTY

(Bank Fraud -- Lines of Credit for HCC Subsidiaries)

THE GRAND JURY FURTHER CHARGES THAT:

1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

2.   From in or about April 1991, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran," and

AKTHAM ABUHOURAN,
a/k/a "Tony Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran" obtained the following lines of credit from the Bank for the use of companies they controlled:

-- $90,000 to Sunrise Aluminum and Glass Company ("Sunrise"),

- 58 -

-- $45,000 to Environmental Contracting Services Corporation ("Environmental"),

-- $90,000 to Interior Finishings, Inc. ("Interior"),

-- $90,000 to Diversified Carpentry, Inc. ("Diversified"), and

-- $90,000 to Masonry Construction Corporation ("Masonry").

In obtaining these loans, they misrepresented to the Bank their personal finances and that of these companies, and misrepresented the purpose of the loans.  Specifically, the defendants, in part, did the following:

a.  They represented that the loan proceeds would be used to support the business of the five companies named above, which purportedly acted as construction subcontractors. In fact, as the defendants knew and intended, the funds were to be used to support the affairs of Houran Construction Company ("HCC"), which was already indebted to the Bank for substantial sums and could not legally borrow additional money from the Bank. The five companies in fact conducted only business which would otherwise be performed by HCC, and were established by the defendants only to create entities which could borrow additional funds from the Bank.

b.  Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" signed a personal guarantee of the loans to Sunrise, Environmental, and Interior, while misrepresenting his personal

finances, as set forth in paragraph 3 of Count One of this Indictment, which is incorporated here by reference.

       c.  Defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" signed a personal guarantee of the loans to Diversified and Masonry, while misrepresenting his personal finances, as set forth in paragraph 3 of Count Five of this Indictment, which is incorporated here by reference.

       d.  In support of the loan to Sunrise, the defendants submitted the personal guarantee of Linton Spencer, and Spencer's financial statement.  That statement had been altered by the defendants, to overstate his cash assets and the value of real estate he owned.

       e.  In support of the loan to Masonry, the defendants supplied a personal guarantee allegedly signed by Steven Botbyl, one of their employees.  Botbyl in fact did not agree to guarantee the loan and his signature was forged by the defendants.

       f.  The defendants did not disclose to the Bank that the companies which received the five lines of credit were not financially capable to repay these loans.

       In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT TWENTY-ONE

(Misapplication -- Lines of Credit for HCC Subsidiaries)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  Between on or about April 23, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

### SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the extension of lines of credit to five companies which were purportedly independent companies which did business with Houran Construction Company ("HCC"), but were in fact completely controlled by HCC and its officers.  The lines of credit totalled $90,000 to Sunrise Aluminum and Glass Company, $45,000 to Environmental Contracting Services Corporation, $90,000 to Interior Finishings, Inc., $90,000 to Diversified Carpentry, Inc. ("Diversified"), and $90,000 to Masonry Construction Corporation ("Masonry").  GARDNER disbursed all of these funds.

3.  This conduct represented misapplication of funds for the following reasons, among others:

a.  The loans were all requested by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," who had created the five

- 61 -

companies for the purpose of obtaining additional loans from the Bank which HCC, which already had a $540,000 line of credit with the Bank, could no longer borrow directly.  GARDNER was aware of the extent of HCC's indebtedness to the Bank, and was aware that the five new companies were located at 517-519 7th Street, the same modest building which housed the office of HCC, and that the officers of the new companies included ABUHOURAN and his brother, defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran," who, as GARDNER knew, also controlled HCC.

       b.  The funds extended to the five borrowers, when aggregated, exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of other officers and directors of the Bank.

       c.  GARDNER did not obtain any security for the loans other than the personal guarantees of other individuals. Some of these guarantees were supplied by persons such as defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran," and Anoush Sharifi, each of whom was already indebted to the Bank for hundreds of thousands of dollars.  Other guarantees were supplied by individuals who worked for HCC, but GARDNER never spoke to any of these persons to verify the financial information submitted in support of their guarantees, and therefore did not learn that much of that information was false.  Moreover, GARDNER did not

speak to Steven Botbyl, who purportedly guaranteed the extension to Masonry, and therefore did not learn that the document submitted which purported to be his personal guarantee was a forgery.

d.   The funds provided to the five companies, when combined with other monies owed to the Bank by parties closely associated with defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," exceeded the amount the Bank was permitted by law to lend to a single borrower.

e.   The loans were made to new companies, which had no business experience at all.  Such extensions of credit, without adequate security, violated the policies adopted by the Bank's board of directors.

f.   GARDNER made the loans without obtaining any financial statements, tax returns, or corporate documents regarding any of the borrowers.  In fact, this omission was specifically called to GARDNER's attention by an attorney representing a person who considered guaranteeing the Diversified loan; the attorney told GARDNER that it was inappropriate that no corporate documents such as articles of incorporation existed regarding the company.  GARDNER made the loans despite this warning.

g.   Although the extensions to the five companies were fashioned as lines of credit, GARDNER permitted the borrowers to draw the total sums approved, and never required any principal payments.  Despite the fact that the lines were fully

extended, GARDNER never converted the credit to term loans with fixed schedules of repayment of principal.

In violation of Title 18, United States Code, Section 656.

<u>COUNT TWENTY-TWO</u>

(Bank Fraud -- John Freda Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

2.   From in or about May 1991, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

KARAM SALIB

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained a line of credit from the Bank for the use of John Freda, in the amount of $75,000, by misrepresenting to the Bank Freda's personal finances. Specifically, ABUHOURAN, in part, did the following:

a.   Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" submitted to the Bank a document which purported to be a financial statement of John Freda dated May 1, 1991. In fact, as

the defendant knew, this statement was wholly fictitious, and Freda was in fact penniless and unable to carry the loan.

   b. Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" also submitted to the Bank in support of the Freda loan documents which purported to be Freda's personal tax returns for the years 1989 and 1990.  These documents, prepared by defendant KARAM SALIB, purported that Freda's adjusted gross income in those years was $73,152 and $84,500, respectively.  In fact, Freda did not file any returns for those years, and had income during each year of no more than $10,000.

   In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT TWENTY-THREE

(Misapplication -- John Freda Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  Between on or about May 29, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the extension of a line of credit to John Freda, in the amount of $75,000, and disbursing those funds.

3.  This conduct represented misapplication of funds for the following reasons, among others:

a.  The funds provided to Freda, when combined with other monies owed to the Bank by parties closely associated with defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," exceeded the amount the Bank was permitted by law to lend to a single borrower.

b.  GARDNER never met with or interviewed Freda. Therefore, he did not learn that Freda was penniless, and had no ability to repay the loan.

c.  With respect to all of the financial information he received regarding Freda, including a financial

- 67 -

statement and tax returns, GARDNER failed to conduct any inquiry regarding the accuracy of the information, and therefore did not discover that material information submitted by ABUHOURAN was false and that the true facts would not have supported the decision to make the loan.

      d. GARDNER made the loan for the stated purpose of financing a new restaurant. This act, financing a new venture in a risky field, was in violation of the Bank's loan policy adopted by its board of directors.

      e. GARDNER did not obtain any security at all for the loan, except for the personal guarantee of a person who was already indebted to the Bank for hundreds of thousands of dollars in other loans.

      In violation of Title 18, United States Code, Section 656.

## COUNT TWENTY-FOUR

(Bank Fraud -- John Planker Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  The first paragraph of Count One of this Indictment is incorporated here by reference.

2.  From in or about June 1991, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendant

HITHAM ABUHOURAN,
a/k/a "Steve Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.  It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained from the Bank the proceeds of a line of credit which had been extended by the Bank to another person.  Specifically, the defendant requested that the Bank disburse to him and to companies he controlled the proceeds of a $100,000 line of credit which the Bank had extended to John Planker, even though neither the Bank nor the defendant had permission from Planker for these actions, and even though the defendant was not legally responsible for repayment of the money.

- 69 -

In violation of Title 18, United States Code, Sections 1344 and 2.

<u>COUNT TWENTY-FIVE</u>

(Misapplication -- John Planker Line of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   Between on or about June 14, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by disbursing over $95,000 of the line of credit extended to John Planker without approval from the borrower.  This conduct represented misapplication of funds because GARDNER disbursed the funds upon the direction of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," who was not responsible for repayment of the loan, and who used the funds for his own purposes and that of his company, Houran Trading Company.

In violation of Title 18, United States Code, Section 656.

<u>COUNT TWENTY-SIX</u>

(Bank Fraud -- Webster Avenue Loans)

THE GRAND JURY FURTHER CHARGES THAT:

1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

2.   From in or about June 1991, to on or about the date of this Indictment, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran,"

AKTHAM ABUHOURAN,
a/k/a "Tony Houran,"

ADMA ABUHOURAN, and

KARAM SALIB

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley and its receiver, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran" (collectively referred to in this Count as the "defendants") obtained loans from the Bank

- 72 -

to 13 borrowers for the acquisition of lots on Webster Avenue,
Kennedy Blvd., and Pamrapo Avenue in Jersey City, New Jersey, and
for the construction of similar houses on those lots.  These
loans, known collectively as the "Webster Avenue loans," were
made to the following persons in the following amounts:

            -- Denise Alaouie, $175,000.

            -- Vitina Marie Ferrulli, $175,000.

            -- Ashraf Saleh, $175,000.

            -- Anoush Sharifi, $175,000.

            -- Karam and Laila Salib, $175,000.

            -- Frances Debabneh, $175,000.

            -- John Freda, $175,000.

            -- Michael Dassatti, $175,000.

            -- George Sawaged, $175,000.

            -- Abdelahad Korya, $175,000.

            -- Kamal Sawaged, $175,000.

            -- Michael and Leyda Perito, $190,000.

            -- Layla Debabneh, $190,000.

The defendants obtained the Webster Avenue loans by
misrepresenting the purpose of the loans and the personal
finances of the borrowers.  Specifically, the defendants, in
part, did the following:

         a.  They represented that they had negotiated
contracts with all 13 borrowers, agreeing with each that for
$240,000 a company controlled by the defendants, 67-90 Webster
Avenue Corporation, would sell a piece of land located on Webster

Avenue, Pamrapo Avenue, or Kennedy Blvd. in Jersey City, New Jersey and build a house on the lot. In truth, none of the borrowers had actually contracted for the purchase of land and construction of a house. All of the borrowers were associates of the defendants. Many had agreed to sign the loan papers only as a favor for the defendants, to permit the defendants to obtain funds of the Bank which the defendants could not borrow directly. The others agreed to sign the papers with the understanding that each would keep the house and be responsible for the loan payments only if he or she liked the house; otherwise, the defendants agreed to be responsible for the loan. The Bank was never informed of these facts.

      b. The Bank was not informed in the loan applications that all of the borrowers were associates of the defendants, and not parties engaged in arm's length transactions. The Bank was specifically not informed:

      -- that Denise Alaouie was the secretary of defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran;"

      -- that Vitina Marie Ferrulli was a personal friend of the ABUHOURAN family;

      -- that Ashraf Saleh was an employee of Houran Construction Company ("HCC");

      -- that defendant KARAM SALIB was HCC's bookkeeper;

      -- that Frances Debabneh was the brother-in-law of defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM

- 74 -

ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran;"

   -- that John Freda was the brother of the girlfriend of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran;"

   -- that George Sawaged was the nephew of Kamal Sawaged, who was an employee of HCC, and that George Sawaged is the first cousin of the wife of defendant ADHAM ABUHOURAN, a/k/a "Adam Houran;"

   -- that Leyda Perito's uncle was a subcontractor who performed work for HCC; and

   -- that Layla Debabneh was the sister of defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran."

   c. The defendants created these loans to allow themselves and companies they controlled to obtain funds of the Bank without being legally responsible for repayment of the funds.

   d. The defendants submitted documents in support of each loan regarding the financial status of each borrower, and all of those documents were fictitious and overstated the borrowers' means.  In truth, none of the borrowers was financially capable to carry his or her loan.

   (1) Toward this end, the defendants submitted a personal financial statement for each borrower, which overstated the individual's income and assets.

(2)   In addition, the defendants submitted documents which purported to be personal income tax returns filed by each borrower (except Saleh) for the years 1989 and 1990.  In fact, these documents, prepared by defendant KARAM SALIB, were not the actual returns filed for the years in question, and overstated the borrowers' income for those years.  For example, the document submitted which purported to be Denise Alaouie's 1989 tax return stated adjusted gross income of $69,567; her actual return for that year reported adjusted gross income of $6,752.

e.   The defendants submitted a document in support of several loans, which purported to be a letter from Dollar Dry Dock Bank stating the conditions by which Dollar Dry Dock would assume the loan following the completion of construction of each house.  All of these letters, with the exception of that addressed to Korya, were forgeries.

f.   The defendants forged the signatures of individual borrowers on several financial statements and other loan application documents.

g.   The defendants misrepresented to the Bank their cost for acquisition of the land which comprised the 13 lots, and thereby misappropriated for their own benefit a substantial sum.

(1)   The defendants represented that they acquired nine lots located on Webster Avenue for a total of $675,000, when the true purchase price was $450,000.  The

defendants further represented that they acquired two lots on Pamrapo Avenue for a total of $150,000, when in fact those lots were already owned at the time of the loans by defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and ADMA ABUHOURAN (and had been acquired three years earlier for only $90,000); the defendants also submitted forged appraisals to the Bank regarding the value of the Pamrapo properties.  By thus misrepresenting their cost for the Webster and Pamrapo properties, the defendants were able to obtain over $300,000 more from the Bank than was required to buy the properties, and divert those funds to their personal use and that of companies they controlled.

(2)   The defendants represented that they purchased three lots on Kennedy Blvd., for a total of $250,000, when they actually bought four lots, for only $240,000.  This misrepresentation allowed the defendants to fraudulently obtain title to the fourth lot, using the Bank's money, without giving the Bank a lien on that property; the defendants then promptly built a house on that extra lot and sold it for $255,000, taking for themselves the entire sum and not repaying any money to the Bank or its receiver.

h.  The loan documents signed by the borrowers called for funds to be extended to the borrowers only upon the completion of stages of construction of their houses.  However, within days of the approval of each loan, the defendants submitted to the Bank fraudulent letters stating that nearly all of the construction of each house was completed, when in fact

- 77 -

virtually no construction at all had taken place.  The defendants were thereby able to obtain from the Bank over $1.2 million in funds to which they were not yet entitled, and divert those funds for their personal use and that of companies they controlled.

i.  Over the course of several years, the defendants constructed houses on several of the Webster Avenue and Pamrapo Avenue lots.  However, until any completed house was sold to a legitimate buyer, the defendants did not make any payments on the Webster Avenue loans.  Further, they rented any completed house to tenants, and collected rents from those tenants, without forwarding any of the money to the Bank or its receiver.

j.  To accomplish the purpose of the scheme, which was to obtain funds of the Bank and apply them to the personal use of the defendants and companies they controlled, the defendants engaged in a series of financial transactions between on or about July 19, 1991 and on or about July 31, 1992 to divert the funds from the recipients of the loans.  These transactions included the following:

(1)  After funds from the Webster Avenue loans were deposited by the Bank of the Brandywine Valley (the "Bank") in the account at the Bank of 67-90 Webster Avenue Corporation, number 5004296, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" wrote the following checks on this account:

(i)  He wrote check number 107, dated July 26, 1991, payable to Karam Salib, in the amount of $25,000,

- 78 -

which defendant KARAM SALIB deposited in his account at Howard
Savings Bank, number 5356253.  In turn, SALIB then wrote check
number 138, also dated July 26, 1991, payable to Banco Central,
in the amount of $25,000.  The SALIB check paid off a portion of
a debt owed to Banco Central, New York City, New York, owed by
HITHAM ABUHOURAN, a/k/a "Steve Houran."

       (ii)  HITHAM ABUHOURAN, a/k/a "Steve
Houran" wrote the following checks payable to Petra Construction
Co., Inc., which were deposited in accounts of Petra at First
Fidelity Bank, Union City, New Jersey:

       (A)  Check number 102, dated
July 22, 1991, in the amount of $200,000.

       (B)  Check number 103, dated
July 24, 1991, in the amount of $550,000.

       (C)  An unnumbered check, dated on
or about August 7, 1995, in the amount of $145,000.

       (D)  Check number 1012, dated
August 8, 1988, in the amount of $380,000.

       (E)  Check number 1015, dated
August 15, 1991, in the amount of $80,000.

       (2)  Following the deposit in accounts at
First Fidelity of the checks to Petra described above, defendants
ADHAM ABUHOURAN, a/k/a "Adam Houran" and AKTHAM ABUHOURAN, a/k/a
"Tony Houran" wrote the following checks on the Petra accounts,
among others:

- 79 -

(i)   Check number 1108, dated August 5, 1991, payable to Raymond E. Murphy, Jr., Esq. Trust Account in the amount of $100,000.   These funds were used to pay a personal debt of the defendants to another bank.

(ii)   Check number 9088, dated on or about August 6, 1991, payable to Houran Construction Co., Inc. in the amount of $380,000.

(iii)   Check number 1133, dated August 13, 1991, payable to Houran Construction Co., Inc. in the amount of $80,000.

(iv)   Check number 1167, dated on or about August 23, 1991, payable to Houran Construction Co., Inc. in the amount of $10,000.

(v)   Check number 9989, dated September 6, 1991, payable to Houran Construction Co., Inc. in the amount of $90,000.

(vi)   Check number 9999, dated on or about September 12, 1991, payable to Houran Construction Co., Inc. in the amount of $80,000.

(vii)   Check number 9998, dated September 25, 1991, payable to Houran Construction Co., Inc. in the amount of $50,000.

In violation of Title 18, United States Code, Sections 1344 and 2.

<u>COUNT TWENTY-SEVEN</u>

(Money Laundering -- Webster Avenue Loans)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment, and paragraph 3 of Count 26 of this Indictment, are incorporated here by reference.

2.  On or about August 5, 1991, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran," and

AKTHAM ABUHOURAN,
a/k/a "Tony Houran"

knowingly conducted and did knowingly aid, abet, and cause the conducting of the following financial transaction affecting interstate commerce:  Defendants ADHAM ABUHOURAN, a/k/a "Adam Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran" wrote a check, number 1108, on the account of Petra Construction Corporation, number 8221401074, at First Fidelity Bank, Union City, New Jersey, payable to "Raymond E. Murphy, Jr., Esq. Trust Account," in the amount of $100,000.

3.  When conducting and aiding, abetting, and causing the conducting of this financial transaction, the defendants knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

4.  The financial transaction described in paragraph 2 involved the proceeds of a specified unlawful activity, that is,

- 81 -

bank fraud, as charged in Count 26 of this Indictment, and the defendants acted with the intent to promote the carrying on of the specified unlawful activity.

In violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

## COUNT TWENTY-EIGHT

### (Misapplication -- Webster Avenue Loans)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   Between on or about June 26, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

### SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving loans to 13 borrowers for the acquisition of lots on Webster Avenue, Kennedy Blvd., and Pamrapo Avenue in Jersey City, New Jersey, and for the construction of identical houses on those lots, and disbursing all loan funds.  These loans, known collectively as the "Webster Avenue loans," were made to the following persons in the following amounts:

-- Denise Alaouie, $175,000.

-- Vitina Marie Ferrulli, $175,000.

-- Ashraf Saleh, $175,000.

-- Anoush Sharifi, $175,000.

-- Karam and Laila Salib, $175,000.

-- Frances Debabneh, $175,000.

-- John Freda, $175,000.

-- Michael Dassatti, $175,000.

- 83 -

-- George Sawaged, $175,000.

-- Abdelahad Korya, $175,000.

-- Kamal Sawaged, $175,000.

-- Michael and Leyda Perito, $190,000.

-- Layla Debabneh, $190,000.

3.   This conduct represented misapplication of funds for the following reasons, among others:

a.   The funds extended to each borrower listed above by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of the chairman of the Bank.

b.   GARDNER made these loans even though he knew that many of the borrowers were related to defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" through employment or family relationships.

c.   The funds provided to the Webster Avenue borrowers, when combined with other monies owed to the Bank by parties closely associated with defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," exceeded the amount the Bank was permitted by law to lend to a single borrower.

d.   In addition, GARDNER never met with or interviewed any of the borrowers, with the exception of Ferrulli. Therefore, he did not learn that most of the borrowers had no intention of making payments on the loans or of acquiring the houses which were being built in their names, but rather had

- 84 -

simply agreed to let their names be used for the purpose of acquiring financing for the use of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and persons associated with him. GARDNER also did not inquire of the individual borrowers and therefore did not learn that most did not have the financial ability to repay the loans. He further did not learn that, contrary to the representations made on false contracts provided to the Bank, none of the borrowers had made any down payment or paid any money at all toward the acquisition of land or construction of a house.

e.  GARDNER made the loans even though the signatures of the same borrower on different loan documents often do not match each other.

f.  In one instance, involving the loan to Vitina Marie Ferrulli, GARDNER was specifically told by Ferrulli by telephone of her limited financial means, which did not support the loan of $175,000 which GARDNER made to her anyway.

g.  GARDNER made the loans even though he received many documents in support of the loans which were fraudulent on their face. These false documents included tax returns for each borrower which were not the actual returns submitted by the borrowers to the Internal Revenue Service for the years in question, and were plainly fictitious and all created by the same person or persons. With respect to all of the financial information he received regarding the borrowers, GARDNER failed to conduct any inquiry regarding the accuracy of the information, and therefore did not discover that material information

- 85 -

submitted by each borrower was false and that the true facts would not have supported the decision to make the loans.

h.  The false documents on which GARDNER relied included letters to most borrowers, purportedly written by an officer of Dollar Dry Dock Bank, stating the conditions by which Dollar Dry Dock would "take out" each loan and provide permanent financing following the construction of each house.  In fact, Dollar Dry Dock did not send any such letter to most borrowers. It did send a letter to borrower Abdelahad Korya, which was provided to GARDNER.  The name and address of Korya, and other information on the letter unique to Korya, was then covered with "white-out," and the letter as doctored was used to create forged letters which were placed in other loan files.  The doctored Korya letter was maintained by GARDNER in his office at the Bank.

i.  The loan documents approved by GARDNER called for funds to be extended to the borrowers only upon the completion of stages of construction of their houses.  In complete disregard of these documents, GARDNER allowed the disbursement of almost all of the loan proceeds within days of the approval of each loan, thereby extending over $1.2 million to defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and others associated with him, even though virtually no construction at all had taken place at the time.

j.  Although the loans were made to finance the acquisition of parcels of property, GARDNER did not obtain documents evidencing the means by which the borrowers and

- 86 -

defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained title
to the property, and therefore did not learn that ABUHOURAN had
fraudulently represented to the Bank the true purchase price of
the property.  GARDNER thereby also did not learn that ABUHOURAN
used the Bank's funds to obtain clear title to a lot on Kennedy
Blvd. with a value of over $70,000, without giving the Bank any
security interest in the property.

   k.  In violation of the policies adopted by the
board of directors, GARDNER accepted appraisals supplied by
defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" regarding the
properties offered as collateral for the loans, and did not
obtain any independent appraisals.

   In violation of Title 18, United States Code, Section
656.

<u>COUNT TWENTY-NINE</u>

(Bank Fraud -- Adma Abuhouran and
U.S.A. Trading Lines of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  The first paragraph of Count One of this Indictment
is incorporated here by reference.

2.  From in or about June 1991, to in or about February
1992, in the Eastern District of Pennsylvania and elsewhere,
defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADMA ABUHOURAN, and

KARAM SALIB

knowingly, and with intent to defraud, engaged in a scheme or
artifice to defraud the Bank of the Brandywine Valley, and to
obtain monies owned by and under the care, custody, and control
of the Bank by means of false and fraudulent pretenses,
representations, and promises, and did aid and abet those acts.

3.  It was part of the scheme and artifice to defraud
and to obtain monies by means of false and fraudulent pretenses,
representations, and promises that defendants HITHAM ABUHOURAN,
a/k/a "Steve Houran" and ADMA ABUHOURAN (collectively referred to
in this Count as the "defendants") obtained related lines of
credit from the Bank, one for ADMA ABUHOURAN, in the amount of
$200,000, and one for her wholly owned company, U.S.A. Trading
Company, Inc. ("U.S.A. Trading"), in the amount of $75,000, by
misrepresenting to the Bank ADMA ABUHOURAN's personal finances

- 88 -

and that of U.S.A. Trading, and by misrepresenting the purpose of the loans.  Specifically, the defendants, in part, did the following:

a.   They falsely represented that the proceeds of the lines of credit would be used to finance the international sale of canned food.  In fact, as the defendants knew and intended, the funds were to be used for the affairs of Houran Construction Company, which was already indebted to the Bank for substantial sums and could not legally borrow additional money from the Bank.

b.   In representing that the funds would be used for the international sale of food, the defendants submitted a fictitious "business plan," setting forth a detailed plan to sell canned foods to merchants in Jordan who would forward the goods to Iraq.  The defendants supplemented this plan with documents which they said showed the availability to them of the food, and the interest of buyers in Jordan; they also submitted a document which they represented was a bond which would indemnify the Bank against any failure of the business.  In truth, the business plan was fictitious, and all of the documents they submitted were forgeries or were otherwise misappropriated.

c.   The defendants submitted a personal financial statement of defendant ADMA ABUHOURAN, who received one line of credit and personally guaranteed repayment of the other.  This statement was false, and overstated her financial status.  The

- 89 -

statement included the following misrepresentations, among others:

      (1)   That defendant ADMA ABUHOURAN had "cash on hand and in banks" in the amount of $200,000.

      (2)   That she had life insurance with a cash value of $150,000.

      (3)   That she owned a company named A. Houran Insurance Agency with a value of $150,000.

      (4)   That she owned a company named U.S.A. Trading Co., Inc. with a value of $30,000.

      In truth, these assets either did not exist or were worth substantially less than the values stated.

      d.  The defendants also submitted documents which purported to be the personal tax returns of ADMA ABUHOURAN for the years 1989 and 1990. These documents, which were prepared by defendant KARAM SALIB, purported that ADMA ABUHOURAN's adjusted gross income in those years was $76,489 and $96,888, respectively. In fact, these documents were not the returns filed by defendant ADMA ABUHOURAN with the Internal Revenue Service for the years in question. The actual tax returns filed with the IRS, which she never provided to the Bank, reported adjusted gross income of ($20,132) and ($13,511) for the years 1989 and 1990, respectively.

      e.  The defendants submitted to the Bank a document which purported to be a financial statement of U.S.A.

Trading, for the period ending December 31, 1990. This statement was false, as U.S.A. Trading had no business affairs at all.

f. In contrast to the financial status depicted by the false documents provided by the defendants to the Bank, neither ADMA ABUHOURAN nor U.S.A. Trading was financially capable to carry the lines of credit.

g. The defendants provided security for the ADMA ABUHOURAN line of credit, in the form of a mortgage on a property held in her name located at 4708-4712 Tonnelle Avenue, North Bergen, New Jersey. Toward this end, they provided a forged appraisal representing that the property was worth $425,000 as of January 20, 1991, when, as the defendants knew, the property was worth roughly half that amount at the time of the Bank's loans, and the property had no value beyond the total of preexisting mortgages on the property.

h. To accomplish the purpose of the scheme, which was to obtain funds of the Bank and apply them to the use of Houran Construction Company and its affiliates, the defendants engaged in a series of financial transactions between on or about October 1, 1991 and on or about July 31, 1992 to divert the funds from the recipients of the loans. These transactions included the following:

(1) After the proceeds of both lines of credit were deposited in the account at the Bank of defendant ADMA ABUHOURAN, number 25002338, she wrote a check on that account, number 1010, dated October 2, 1991, in the amount of

$250,000, payable to herself.  She deposited the check in her account, number 680-0418397, at the Bank of New York, Orangeburg, New York.

(2)  ADMA ABUHOURAN then further transferred the funds, by writing the following checks on her account at the Bank of New York, payable to herself, and depositing them in another Bank of New York account in her name, number 687-0759302:

(i)  Check number 101, dated October 9, 1991, in the amount of $90,000.

(ii)  Check number 102, dated October 22, 1991, in the amount of $160,000.

(3)  ADMA ABUHOURAN then requested that the Bank of New York, on or about February 27, 1992, transfer $240,000 of the funds in account number 687-0759302 to a new account, number 680-0079940, held in the name of Capital Mortgage Corp. of the U.S.

(4)  In the Capital Mortgage account, ADMA ABUHOURAN then engaged in the following transactions:

(i)  She wrote check number 91, dated March 3, 1992, payable to Hitham Abuhouran in the amount of $75,000, which was deposited in the account of Houran Construction Company, number 184000483, at United Jersey Bank, Union City, New Jersey.

(ii)  She requested a transfer by wire of $40,000 from the Capital Mortgage account, to the Houran

Construction account at United Jersey, on or about March 12, 1992.

(iii)   She requested a transfer by wire of $50,000 from the Capital Mortgage account, to the Houran Construction account at United Jersey, on or about March 26, 1992.

(iv)   She wrote check number 1006, dated April 15, 1992, payable to Hitham Abuhouran in the amount of $100,000, which was deposited in the account of Petra Construction Co., number 184000505, at United Jersey.   Petra Construction was completely controlled by Houran Construction Company.

(v)   She wrote check number 1012, dated July 17, 1992, payable to Adham Abuhouran in the amount of $10,000, which was deposited in the account of Petra Construction Co. at United Jersey.

In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT THIRTY

(Interstate Transportation of Property Obtained by Fraud
-- Adma Abuhouran and U.S.A. Trading Lines of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

On or about October 2, 1991, in the Eastern District of Pennsylvania, and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

ADMA ABUHOURAN

did unlawfully transport and did cause and aid and abet the transporting in interstate commerce from West Chester, Pennsylvania to Orangeburg, New York of money which was taken by fraud, that is, the proceeds of a check written on the account of Adma Abuhouran at the Bank of the Brandywine Valley, West Chester, Pennsylvania, knowing the same to have been taken by fraud. The check, number 1010 on account number 25002338, was dated October 2, 1991, payable to Adma Abuhouran, in the amount of $250,000. It was deposited by ADMA ABUHOURAN in her account, number 680-0418397, at the Bank of New York, Orangeburg, New York. This check represented proceeds of the bank fraud described in Count 29 of this Indictment.

In violation of Title 18, United States Code, Sections 2314 and 2.

bank fraud, as charged in Count 29 of this Indictment, and the defendants acted with the intent to promote the carrying on of the specified unlawful activity.

In violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

<u>COUNT THIRTY-TWO</u>

(Misapplication -- Adma Abuhouran and
U.S.A. Trading Lines of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   Between on or about September 9, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving the extension of a line of credit to defendant ADMA ABUHOURAN, in the amount of $200,000, and a related line of credit to her company, U.S.A. Trading Company, in the amount of $75,000, and by disbursing those funds.

3.   This conduct represented misapplication of funds for the following reasons, among others:

a.   GARDNER knew that the funds extended to ADMA ABUHOURAN and U.S.A. Trading, while supposedly separate loans, were actually both made to ADMA ABUHOURAN for her personal use. The total of these related loans exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of other officers and directors of the Bank.

- 97 -

b.   The funds provided to these borrowers, when combined with other monies owed to the Bank by parties closely associated with them, exceeded the amount the Bank was permitted by law to lend to a single borrower.   GARDNER knew that the loans were related to those to defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and entities he controlled, as GARDNER received many of the pertinent documents regarding the loans from HITHAM ABUHOURAN, a/k/a "Steve Houran."

c.   GARDNER failed to conduct any inquiry regarding the financial information provided by the borrowers in support of the request for the loans, and therefore did not discover that material information submitted by the borrowers was false and that the true facts would not have supported the decision to make the loans.   Further, GARDNER did not obtain any information at all regarding the accounts receivable which allegedly secured the loan to U.S.A. Trading, nor did he obtain any information regarding A. Houran Insurance Agency, which guaranteed repayment of the U.S.A. Trading loan.

d.   In violation of the policies adopted by the board of directors, GARDNER accepted an appraisal supplied by the borrower regarding the property offered as collateral for the loan, and did not obtain an independent appraisal.   He further made no inquiry into the accuracy of the supplied appraisal or the qualifications of its author, and therefore did not learn that the appraisal he received was fraudulent.   In fact, the

appraisal he received was quite unprofessional and fraudulent on its face.

        e.  GARDNER approved the loans despite the fact that other documents submitted in support of the loans were fraudulent on their face.  For example, a bond submitted by ADMA ABUHOURAN was represented by her as protecting the interest of her company, U.S.A. Trading Company, in an international sale of canned foods, when in fact the bond she supplied was actually obtained by a different company to secure a $20,000 contract for the construction of a road in New Jersey.  Moreover, other documents submitted by ADMA ABUHOURAN stated a plain intention to use the loan funds to finance the shipment of goods destined for Iraq, in violation of the Iraq Sanctions Act which was effective November 5, 1990.  If the loans made by GARDNER were used for this purpose the Bank would have been exposed to serious legal and possible criminal penalties, yet GARDNER approved the loans anyway.

        f.  Although the extensions to the borrowers were fashioned as lines of credit, GARDNER permitted the borrowers to draw the total sums approved, and never required any principal payments.  Despite the fact that the lines were fully extended, GARDNER never converted the credit to term loans with fixed schedules of repayment of principal.

        In violation of Title 18, United States Code, Section 656.

## COUNT THIRTY-THREE

(Bank Fraud -- 1014 Anderson Avenue Corp. Loan)

THE GRAND JURY FURTHER CHARGES THAT:

1.   The first paragraph of Count One of this Indictment is incorporated here by reference.

2.   From in or about August 1991, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendant

HITHAM ABUHOURAN,
a/k/a "Steve Houran"

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.   It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" obtained a loan from the Bank in the name of 1014 Anderson Avenue Corporation, in the amount of $300,000, by misrepresenting to the Bank the purpose of the loan and other material facts.  Specifically, the defendant, in part, did the following:

a.   He represented that the loan would be used to acquire the property located at 1014 Anderson Avenue, Fort Lee, New Jersey.  Toward this end, he provided an appraisal stating that the property had a value of $379,000, and therefore was

- 100 -

adequate security for the $300,000 loan.  In fact, as the defendant knew, the appraisal was a forgery, and the defendant was actually buying the property for only $225,000.  This fraudulent conduct permitted the defendant to acquire the property using only the Bank's money, and obtain an additional $75,000 for his personal use.

b.  The defendant also informed the Bank that he was acquiring the property together with his fiancee, and that she too would be responsible for the loan.  Toward this end, he provided documents which purported to be his fiancee's personal financial statement, and tax returns she filed for the years 1989 and 1990.  In truth, these documents were forgeries, and overstated his fiancee's true financial condition.  Further, at the time the loan was made, his fiancee did not become responsible at all for repayment of the loan.

c.  In truth, the loan was made solely for the benefit of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran."  He was aware that he was already personally indebted to the Bank for sums in excess of $1 million, and therefore pursuant to state law and Bank policy could no longer borrow any money for himself from the Bank.

In violation of Title 18, United States Code, Sections 1344 and 2.

<u>COUNT THIRTY-FOUR</u>

(Misapplication -- 1014 Anderson Avenue Corp. Loan)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   Between on or about August 14, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by approving a loan to 1014 Anderson Avenue Corporation ("Anderson") in the amount of $300,000, and disbursing those funds.

3.   This conduct represented misapplication of funds for the following reasons, among others:

a.   The funds extended to Anderson by GARDNER exceeded the amount of a loan which GARDNER was permitted to personally approve, pursuant to the loan policy adopted by the Bank's board of directors; yet GARDNER did not seek or obtain the required approval of other officers and directors of the Bank and in fact attempted to hide the existence of this credit from them.

b.   GARDNER placed a false document in the Anderson loan file, stating that members of the board of directors had approved the loan, when that was in fact not true.

- 102 -

c.  At the time he approved the loan and signed the cashier's check disbursing the proceeds of $300,000 on or about October 23, 1991, GARDNER did not enter the loan in the books of the Bank, or place the loan file with the other loan files of the Bank.  These actions were part of his effort to hide the existence of the loan from other officers and directors of the Bank, and from government examiners.

d.  The funds provided to Anderson, whose president was defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," when combined with other monies owed to the Bank by ABUHOURAN and parties closely associated with ABUHOURAN, exceeded the amount the Bank was permitted by law to lend to a single borrower.

e.  Although the loan was made to finance the acquisition of a piece of property, GARDNER did not obtain documents evidencing the means by which the borrower obtained title to the property.  Had he done so, he would have determined that the borrower had fraudulently represented to the Bank the true purchase price of the property.  Anderson thereby successfully borrowed from the Bank $75,000 more than the total purchase price of the property, and that money was diverted to ABUHOURAN.

f.  In violation of the policies adopted by the board of directors, GARDNER accepted an appraisal supplied by the borrower regarding the property offered as collateral for the loan, and did not obtain an independent appraisal.  He further made no inquiry into the accuracy of the supplied appraisal, and

- 103 -

therefore did not learn that the appraisal he received was fraudulent.

g.   Further, GARDNER did not receive any documents regarding the corporate status of the borrower, such as articles of incorporation and an authorization by the corporation's board for the loan.   In fact, Anderson had not been incorporated at the time the loan was made, and could not produce such documents.

In violation of Title 18, United States Code, Section 656.

COUNT THIRTY-FIVE

(Misapplication -- Houran Construction Co. Overdrafts)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  Between on or about January 1, 1991 and on or about December 10, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by permitting large overdrafts in the depository account at the Bank of Houran Construction Company ("HCC").  GARDNER knowingly permitted such overdrafts on numerous days throughout 1991, on some days of amounts as high as $341,021.77.  Even though these overdrafts amounted to the extension of additional loans in these amounts to HCC, in an amount beyond that which GARDNER could personally approve without consultation with other officers and directors of the Bank, GARDNER never submitted the overdrafts for approval to anyone else, and instead took steps to hide their existence from others.  In addition, GARDNER never charged or collected interest for these extensions of credit.

In violation of Title 18, United States Code, Section 656.

- 105 -

COUNTS THIRTY-SIX TO FORTY-SIX

(False Entries in Bank Records)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   At West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER,

with intent to deceive the other officers and directors of the Bank of the Brandywine Valley and the agent or examiner appointed by the Board of Governors of the Federal Reserve System to examine the affairs of the Bank, knowingly made false entries in the books of the Bank, as set forth below.

3.   The policies of the Bank required that the Director's Loan Committee ("DLC"), a committee consisting of the Bank's chairman and at least two other members of the Bank's board of directors, in addition to GARDNER, review all extensions of credit in an amount in excess of $250,000, and review any loan of any amount made to a person or entity located outside the Bank's local market area.

4.   On or about the dates listed below, GARDNER completed and inserted in the Bank's loan files forms stating that the extensions of credit described below had been submitted to and approved by the DLC, when in fact, as GARDNER then knew, the DLC had not been informed of or approved any of these extensions.

| Count | Date | Subject |
|-------|------|---------|
| 36 | 8/17/90 | Increase in Hitham Abuhouran line from $250,000 to $320,000 |
| 37 | 11/21/90 | Loan to Nasser Plaza for $350,000 |
| 38 | 12/11/90 | Increase in Houran Construction Co. line from $250,000 to $350,000 |
| 39 | 1/14/91 | Loan to 415-435 Summit Avenue Corp. for $325,000 |
| 40 | 1/15/91 | Increase in Houran Construction Co. line from $350,000 to $475,000 |
| 41 | 1/28/91 | Increase in Houran Construction Co. line from $475,000 to $540,000 |
| 42 | 2/1/91 | Increase in Houran Trading Co. line from $250,000 to $350,000 |
| 43 | 3/27/91 | Increase in Hitham Abuhouran line from $320,000 to $405,000 |
| 44 | 4/2/91 | Loan to Houran Plaza Associates for $350,000 |
| 45 | 5/15/91 | Extension of due date for repayment of Hitham Abuhouran's $405,000 line of credit |
| 46 | 9/5/91 | Loan to 1014 Anderson Avenue Corp. for $300,000 |

All in violation of Title 18, United States Code, Section 1005.

- 107 -

COUNT FORTY-SEVEN

(Bank Fraud -- Theft of Over $2.5 Million)

THE GRAND JURY FURTHER CHARGES THAT:

1.  The first paragraph of Count One of this Indictment is incorporated herein by reference.

2.  From in or about October 1991, to in or about November 1991, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran,"

AKTHAM ABUHOURAN,
a/k/a "Tony Houran," and

KASSEM ALAOUIE

knowingly, and with intent to defraud, engaged in a scheme or artifice to defraud the Bank of the Brandywine Valley, and to obtain monies owned by and under the care, custody, and control of the Bank by means of false and fraudulent pretenses, representations, and promises, and did aid and abet those acts.

3.  It was part of the scheme and artifice to defraud and to obtain monies by means of false and fraudulent pretenses, representations, and promises that defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," AKTHAM ABUHOURAN, a/k/a "Tony Houran," and KASSEM ALAOUIE stole over $2.5 million from the Bank by depositing worthless checks at the Bank and withdrawing funds representing and exceeding the

- 108 -

face amounts of the checks.  Specifically, the defendants, in part, did the following:

a.   On or about October 22, 1991, defendant KASSEM ALAOUIE wrote two checks on his personal account at Provident Savings Bank, Union City, New Jersey, each payable to Houran Trading Co.  The checks were in the amounts of $400,000 and $575,000.  On or about October 24, 1991, defendant KASSEM ALAOUIE wrote two additional checks on this account payable to Houran Trading Co., in the amounts of $825,000 and $610,000.  All of these checks were worthless, as the balance in ALAOUIE's account at the time was $1,200.82.

b.   Defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," the owner of HTC, knowing that the checks were worthless, deposited them in the account of Houran Trading Company at the Bank of the Brandywine Valley.  He deposited the $400,000 and $575,000 checks on October 23, 1991; the $825,000 check on October 24, 1991; and the $610,000 check on October 25, 1991.  The balance in the Houran Trading account prior to these deposits was $3,085.47.

c.   Between on or about October 23, 1991 and on or about October 28, 1991, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" withdrew a total of $2,527,812.15 from the Houran Trading account, by writing checks on the account, and requesting the issuance of cashier's checks and wire transfers using funds from the account.  The funds were diverted to accounts of defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a

- 109 -

"Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran," and of companies they controlled, both at the Bank and at other financial institutions.

       d.   During the same period of time, defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran" further moved the funds taken from the Bank, by writing scores of checks on the accounts in which the Houran Trading funds were deposited. The funds were ultimately applied for the personal benefit of these defendants and of companies they controlled.  For example, $142,000 was paid to satisfy a personal debt owed by defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran," which was secured by their personal residence; $175,000 was used by defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" for the down payment for a new personal residence for his family; $40,000 was used by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" to pay a gambling debt owed to an Atlantic City, New Jersey casino; tens of thousands of dollars were used to pay overdue credit card and mortgage payments owed by the defendants; and over $1.9 million was used to support the defendants' company, Houran Construction Company, and its subsidiaries.

       In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT FORTY-EIGHT

### (Conspiracy to Make False Statements
### to Bank and to Commit Perjury)

THE GRAND JURY FURTHER CHARGES THAT:

    1.  The first paragraph of Count One of this Indictment is incorporated here by reference.

    2.  From on or about October 30, 1991, to on or about February 21, 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran,"

AKTHAM ABUHOURAN,
a/k/a "Tony Houran,"

ADMA ABUHOURAN, and

KASSEM ALAOUIE

did knowingly and willfully combine, conspire, confederate, and agree, together and with each other, and with other persons known and unknown to the grand jury (including persons referred to herein as "DA" and "IA"), to make false statements to the Bank of the Brandywine Valley and to commit perjury.  Specifically, the defendants did so conspire to commit the following offenses against the United States:

    -- to make materially false statements, and to overvalue land and property, for the purpose of influencing the Bank in its consideration of the advance of funds to Houran Trading Company, the renewal of and deferment of action with

- 111 -

respect to that advance, and the acceptance, release, and substitution of security for that advance, in violation of Title 18, United States Code, Section 1014; and

-- to commit perjury, that is, while under oath as a witness in a proceeding before or ancillary to a case pending before a United States District Court, to knowingly make false material declarations, in violation of Title 18, United States Code, Section 1623.

### Manner and Means

3. As stated in Count 47 of this Indictment, between October 23, 1991 and October 25, 1991, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" deposited four checks at the Bank, in the account of Houran Trading Company, totaling $2,410,000, knowing these checks to be worthless. Between on or about October 23, 1991 and on or about October 28, 1991, ABUHOURAN then withdrew $2,527,812.15 from the Houran Trading account. The goal of the conspiracy was to prevent the Bank from learning that these transactions were fraudulent, to convince the Bank not to use legal means to recover the withdrawn funds, and, once the Bank availed itself of such legal means, to deceive a court of law as to the true nature of the transactions and to prevent the Bank from successfully recovering the money.

4. The Bank did not learn that the deposited checks were worthless, and that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" had improperly withdrawn the funds, until October 30, 1991. It was part of the conspiracy that, commencing on October

30, 1991, ABUHOURAN told a false story to officials of the Bank to explain his actions, and to attempt to convince the Bank not to attempt to recover the withdrawn funds from him.  ABUHOURAN explained the deposit of the checks by stating that he had been engaged in an international sale of goods, in which he was selling products to a buyer located in Lebanon.  He said that the buyer had sent checks totaling $2,410,000 to defendant KASSEM ALAOUIE, the broker representing ABUHOURAN in the alleged deal, as payment for the goods.  ABUHOURAN stated that ALAOUIE then wrote checks totaling the same amount to ABUHOURAN's company, Houran Trading Company, which ABUHOURAN then deposited at the Bank.  ABUHOURAN stated that ALAOUIE's checks had bounced due to a delay in the honoring of the buyer's checks by ALAOUIE's bank, a problem ABUHOURAN said would be resolved shortly.

5.  As part of the conspiracy, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" continued to tell a similar story to Bank officials during the month of November 1991.  The story was false, as no such international deal had taken place.

6.  On November 15, 1991, Bank officials met with defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" to request repayment of the funds ABUHOURAN had withdrawn from the Bank.  It was a further part of the conspiracy that ABUHOURAN stated that he could not return the funds at that time, saying that all of it had been expended.  That statement was false, as approximately $1 million of the withdrawn funds remained in the possession and control of ABUHOURAN and members of his immediate family at the time.

7.  It was a further part of the conspiracy that, on
November 15, 1991, defendant HITHAM ABUHOURAN, a/k/a "Steve
Houran" made further efforts to convince Bank officials to defer
actions to recover the money from him.  To this end, he signed a
note on behalf of Houran Trading Company, promising to repay the
sum of $2,410,000 by February 15, 1992.  This note was
fraudulent, in that Houran Trading had few assets and no ability
to pay the note.

8.  It was a further part of the conspiracy that
defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and three of his
siblings -- defendants ADHAM ABUHOURAN, a/k/a "Adam Houran,"
AKTHAM ABUHOURAN, a/k/a "Tony Houran," and ADMA ABUHOURAN --
signed mortgages to seven properties of which they were the
owners of record, representing that the Bank could seize these
properties if Houran Trading failed to pay the note.  In offering
these mortgages, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran"
represented that the value of the properties was over $1.7
million greater than the preexisting debt on the properties, and
that the Bank would have a first mortgage position on each.
These statements were false, and the tendering of the mortgages
by the defendants was a fraudulent effort to deceive the Bank
into believing that Houran Trading's debt was secured by
property.  In truth, the defendants did not own all of the seven
properties, some of the properties they did own were facing
foreclosure due to the defendants' failure to pay previous debts,
and all of the properties had virtually no value beyond the

- 114 -

preexisting debt which in fact had priority over the Bank's liens.

9.   It was a further part of the conspiracy that in late November 1991 defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" showed shoes located in a Union City, New Jersey warehouse basement to representatives of the Bank, offering to give the Bank a security interest in the shoes and stating that the shoes were worth as much as $1 million.  ABUHOURAN further promised that this security interest would partially guarantee Houran Trading's note promising to repay the withdrawn funds to the Bank.  In truth, the shoes were worth no more than $70,000 and ABUHOURAN had merely a one-third ownership interest in the goods; and the Bank never received a security interest in these goods.

10.   In December 1991, after the defendants had failed to repay any of the $2.5 million in withdrawn funds, the Bank filed a civil action against the defendants and others, in the United States District Court for the Eastern District of Pennsylvania.  The Bank sought recovery of the withdrawn funds, and specifically requested that the Court issue a restraining order barring the defendants from spending their assets.  On Saturday, December 21, 1991, the Court held an emergency hearing to consider the request for a restraining order.

11.   It was a further part of the conspiracy that at the hearing, on December 21, 1991, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" gave false testimony under oath as part of

- 115 -

his continuing effort to thwart the Bank's attempts to recover the money he had taken.  His false statements included the following:

a.  He testified that the checks he deposited at the Bank were derived from an international sale of goods.  He stated that he had agreed to sell items, including shoes, sweaters, corned beef, sardines, and army boots, which were located in Jordan and the United States, and which he had acquired for a total price of $5.1 million.  He said that the buyer, who maintained offices in Jordan and Beirut, had sent two checks in partial payment for the goods.  He said that the checks, in the amounts of $975,000 and $1,475,000, were sent to defendant KASSEM ALAOUIE, who acted as the broker in the alleged deal.

b.  ABUHOURAN testified that he accompanied ALAOUIE to ALAOUIE's bank, Provident Savings Bank, to deposit the foreign checks.  ABUHOURAN stated that after receiving the checks and contacting the American bank which represented the foreign bank on which the checks were written, a representative of Provident told ALAOUIE and ABUHOURAN that the foreign checks would be honored and that the funds would be available in ALAOUIE's account the following day.

c.  ABUHOURAN testified that ALAOUIE then wrote four checks on ALAOUIE's account, totaling $2,410,000, which ABUHOURAN deposited at the Bank of the Brandywine Valley. ABUHOURAN testified that he believed these checks were good at

- 116 -

the time he deposited them, based on the representation of the Provident officer that the two foreign checks would be honored.

d.   ABUHOURAN acknowledged that he withdrew for himself $275,000 of the funds deposited in the Houran Trading account, but stated that all of that money had been spent and therefore could not be returned to the Bank.

e.   ABUHOURAN testified that a portion of the goods he intended to sell remained in the United States, and had a value of $1.5 million.

This testimony was false, as ABUHOURAN knew.  There was never any international sale in which a buyer sent over $2.4 million to ALAOUIE.  ALAOUIE and ABUHOURAN did attempt to make a deposit at Provident, but it was of one check allegedly written on a Lebanese bank, in the amount of $975,000; no second check was presented.  Further, the Provident officer who accepted the check did not state that the funds would be available the following day, but rather stated that she was unsure how long it would take the check to clear and that it could be as long as a month.  ABUHOURAN therefore knew that no funds were available to ALAOUIE at the time ABUHOURAN deposited ALAOUIE's checks at the Bank of the Brandywine Valley.  ABUHOURAN's statement that all of the money he personally withdrew had been spent was also false, as a substantial portion of that money remained under his possession and control as of the date of the hearing.  It was also false that ABUHOURAN held goods in the United States with a value of $1.5 million.

- 117 -

12.   Following the hearing, the Court declined to issue the requested restraining order.  Attorneys representing the Bank then commenced the process of taking sworn testimony, at depositions, from witnesses in the case, in an effort to establish the Bank's right to recover the withdrawn funds from the defendants.

13.  At these depositions, the representatives of the Bank inquired into the circumstances surrounding the deposit at the Bank of the checks totaling $2,410,000.  It was a further part of the conspiracy that defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and other witnesses persisted in their false story regarding the supposed international deal and the deposit of the checks.  These false statements included the following:

a.  At depositions conducted on January 4, 1992 and February 4, 1992, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" repeated the facts described in paragraph 11 above regarding the supposed international sale.  He added that the buyer of the goods was named "Chahal," who had been found by defendant KASSEM ALAOUIE and with whom ABUHOURAN had not previously done business.  This testimony was false, as ABUHOURAN had previously engaged in business with a company called Abeer Chahal Trading and Shipping Agencies, and he borrowed that name as the fictitious participant in the October 1991 transaction which never took place.

b.  At the same deposition, ABUHOURAN testified that a portion of the goods involved in the international sale

- 118 -

was an inventory of shoes held in his warehouse in Union City, New Jersey.  He testified that he bought these shoes in 1990 from a seller located in New York, for $100,000 in cash, after responding to an advertisement in the New York Times.  These statements were false.  In truth, the shoes had been purchased from defendant KASSEM ALAOUIE, for a total of $25,000, by a partnership of which ABUHOURAN was only one of three members.

   c.  At a deposition taken on January 29, 1992, defendant KASSEM ALAOUIE reported the same facts earlier stated by ABUHOURAN, as explained in paragraph 11 and in subparagraph (a) of this paragraph, regarding ALAOUIE's alleged negotiation to sell goods to a buyer named Chahal, ALAOUIE's receipt from Chahal of two checks totaling over $2.4 million, ALAOUIE's deposit of these checks in his account at Provident Savings Bank, and the assurance given by a Provident officer that the deposited funds would be available in one day.  All of this testimony was false.

   d.  At a deposition taken on January 5, 1992, defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" falsely testified that he did not know any details regarding the October 1991 deposit of checks at the Bank.

   e.  At a deposition taken on January 30, 1992, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" falsely testified that he did not know any details regarding the October 1991 deposit of checks at the Bank.

   14.  It was a further part of the conspiracy that during the course of the litigation between the Bank and the

defendants, defendants HITHAM ABUHOURAN, a/k/a "Steve Houran" and KASSEM ALAOUIE produced documents to the Bank which they said were the contracts and related correspondence by which ABUHOURAN obtained the goods he allegedly sold in October 1991, and by which ABUHOURAN then sold the goods to a buyer located in Lebanon.  All of these documents were forgeries, and the deals they described were fictitious and had never occurred.

15.  It was a further part of the conspiracy that, at the depositions and in other testimony, the witnesses made false statements regarding the disposition of the $2.5 million in funds withdrawn from the Bank, in an effort to thwart the Bank's efforts to locate the money.  These false statements included the following:

a.  At a deposition on February 4, 1992, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" testified that he had nothing to do with Petra Construction Company, an entity which had received a portion of the withdrawn funds.  This statement was false, as ABUHOURAN in fact controlled Petra.

b.  At the February 4, 1992 deposition, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" testified that a check for $175,000 given by Houran Construction Company to defendant ADHAM ABUHOURAN, a/k/a "Adam Houran," which was derived from the withdrawn funds, represented a repayment to ADHAM ABUHOURAN of loans ADHAM ABUHOURAN had made earlier to HCC.  This statement was false, as no such loans had ever been made, and the payment to ADHAM ABUHOURAN was merely a diversion of the stolen money.

c.   At a deposition conducted on January 30, 1992, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" testified that he received $150,000 from a person known to the grand jury as IA, which was derived from the withdrawn funds.  ADHAM ABUHOURAN said that he owned over $150,000 in deposits in Jordan, held by a person known as the "sultan."  Further, he testified, in late 1991 IA's father, a resident of Jordan, asked to borrow $150,000 from him.  ADHAM ABUHOURAN said that he therefore instructed the "sultan" to release $150,000 to IA's father in Jordan, and then ADHAM ABUHOURAN was repaid by taking $150,000 from IA in the United States.  All of this testimony was false, as the transaction with IA's father never took place, and ADHAM ABUHOURAN never received any money from IA in 1991.  Rather, ADHAM ABUHOURAN's portion of the withdrawn funds was delivered to him in a check written on the account of Houran Construction Company.

d.   On January 30, 1992, IA falsely testified at a deposition conducted as part of the Bank's lawsuit.  IA testified that IA received $150,000 of the proceeds of the withdrawn funds, and at the request of IA's father turned the money over to ADHAM ABUHOURAN, a/k/a "Adam Houran."  All of the testimony was false, as IA never gave any money to ADHAM ABUHOURAN in 1991, but rather gave the $150,000 IA received to AKTHAM ABUHOURAN, a/k/a "Tony Houran," as part of the effort by the defendants to conceal the disposition of the $2.5 million obtained by fraud and divert much of it to Houran Construction Company.

- 121 -

e.   At the January 30, 1992 deposition, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" testified falsely about where he resided.   He stated that he maintained residences at 338 Orangeburgh Road, Old Tappan, New Jersey, and at 816 Palisade Avenue, Union City, New Jersey.   In fact, he was living at 31 Wildwood Road, Saddle River, New Jersey, a residence he purchased in December 1991 using his $175,000 share of the stolen money. ADHAM ABUHOURAN testified falsely regarding his residence so as not to disclose his use of the proceeds of the withdrawn funds.

f.   In his testimony before the Court on December 21, 1991, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" explained the payment to defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" of $55,000 from the withdrawn funds, by claiming that this money was given to AKTHAM ABUHOURAN to repay loans AKTHAM ABUHOURAN made to Houran Construction Company in October 1991.   At his deposition on February 4, 1992, HITHAM ABUHOURAN gave an inconsistent explanation of this payment, stating that the $55,000 was paid to compensate AKTHAM ABUHOURAN for work he performed on behalf of Houran Trading Company over a year earlier.   Both explanations were false, as the payment to AKTHAM ABUHOURAN was simply a diversion of stolen money, and no loan repayment or payment of compensation ever occurred.

16.   It was a further part of the conspiracy that, at the depositions, the witnesses made false statements regarding the defendants' finances and the finances of companies controlled by the defendants.   These statements were made to attempt to

- 122 -

persuade the Bank and the Court that the defendants were honest businesspersons who had always dealt honestly with the Bank, and had continued to deal honestly with respect to the events of October 1991.  The false statements included the following:

    a.  At a deposition on January 28, 1992, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" testified that financial statements and tax returns given to the Bank in support of earlier extensions of credit to Houran Construction Company were authentic.  These statements were false, and the documents were fictitious, as described in paragraph 3 of Count Three of this Indictment.

    b.  At a deposition on February 8, 1992, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" testified that Houran Construction Company did not have a severe cash flow problem during the summer of 1991, at the same time it was indebted to the Bank for over $500,000.  This testimony was false.

    c.  At the February 8, 1992 deposition, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" testified that his company, 67-90 Webster Avenue Corporation, had entered contracts with 13 individuals for the construction of houses in Jersey City, New Jersey, and thus that the Bank's loans to these individuals were legitimate.  All of this testimony was false.  As set forth in more detail in Count 26 of this Indictment, which is incorporated here by reference, these 13 contracts in which 67-90 Webster Avenue Corporation purportedly engaged were fictitious.

d. On January 29, 1992, a person known to the grand jury (referred to as "DA") falsely testified at a deposition conducted as part of the Bank's lawsuit.  DA testified that DA had entered a contract with 67-90 Webster Avenue Corporation, an entity controlled by HITHAM ABUHOURAN, a/k/a "Steve Houran," for the construction of a house at 73 Pamrapo Avenue, Jersey City, New Jersey.  This testimony was false, and was offered to conceal that a loan received by DA from the Bank was based on fictitious documents and had been designed only to fraudulently obtain money for defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and persons closely associated with him.

e. At a deposition on January 30, 1992, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" testified that he performed no services for 67-90 Webster Avenue Corporation.  That testimony was false.

f. At the January 30, 1992 deposition, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" testified that a personal financial statement and tax returns given to the Bank in support of a line of credit he received were authentic and gave an accurate depiction of his financial condition as of the dates written on the documents.  These statements were false, and the documents were fictitious, as described in paragraph 3 of Count Seven of this Indictment.

## Overt Acts

In furtherance of the conspiracy and to achieve its objects, defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM

- 124 -

ABUHOURAN, a/k/a "Adam Houran," AKTHAM ABUHOURAN, a/k/a "Tony Houran," ADMA ABUHOURAN, and KASSEM ALAOUIE, and other persons known and unknown to the grand jury, committed the following overt acts, among others, within the Eastern District of Pennsylvania and elsewhere:

1. On November 15, 1991, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" met with officials of the Bank, and signed a note on behalf of Houran Trading Company promising to repay $2,410,000 to the Bank.

2. On November 15, 1991, defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" provided mortgages to the Bank of properties located at 520 7th Street, Union City, New Jersey; 227 Martin Luther King, Jersey City, New Jersey; and 6313 Broadway, West New York, New Jersey, to secure the note given to the Bank by Houran Trading Company.

3. On November 15, 1991, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" provided a mortgage to the Bank of the property located at 4700-4704 Tonnelle Avenue, North Bergen, New Jersey, to secure the note given to the Bank by Houran Trading Company.

4. On November 15, 1991, defendant ADMA ABUHOURAN provided a mortgage to the Bank of the property located at 4708-4712 Tonnelle Avenue, North Bergen, New Jersey, to secure the note given to the Bank by Houran Trading Company.

5. On November 15, 1991, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" provided mortgages to the Bank of properties

located at 903-905 New York Avenue, Union City, New Jersey, and
167 Monticello, Jersey City, New Jersey, to secure the note given
to the Bank by Houran Trading Company.

6.   On December 21, 1991, defendant HITHAM ABUHOURAN,
a/k/a "Steve Houran" testified before the United States District
Court for the Eastern District of Pennsylvania, and offered false
testimony as described in part in paragraph 11 above.

7.   On January 4, 1992, January 28, 1992, February 4,
1992, and February 8, 1992, defendant HITHAM ABUHOURAN, a/k/a
"Steve Houran" testified in depositions, and offered false
testimony as described in part in paragraphs 13, 15, and 16
above.

8.   On January 5, 1992, defendant AKTHAM ABUHOURAN,
a/k/a "Tony Houran" testified in a deposition, and offered false
testimony as described in part in paragraph 13(d) above.

9.   On January 29, 1992 and February 4, 1992, defendant
KASSEM ALAOUIE testified in depositions, and offered false
testimony as described in part in paragraph 13(c) above.

10.   On January 30, 1992, defendant ADHAM ABUHOURAN,
a/k/a "Adam Houran" testified in a deposition, and offered false
testimony as described in part in paragraphs 13, 15, and 16
above.

All in violation of Title 18, United States Code,
Section 371.

## COUNT FORTY-NINE

### (Perjury)

THE GRAND JURY FURTHER CHARGES THAT:

  1. Paragraph 1 of Count One of this Indictment is incorporated here by reference.

  2. On or about December 21, 1991, at Philadelphia, in the Eastern District of Pennsylvania, defendant

HITHAM ABUHOURAN,<br>
a/k/a "Steve Houran,"

while under oath as a witness in a case then being heard before the United States District Court for the district entitled <u>The Bank of the Brandywine Valley v. Hitham Abuhouran, et al.</u>, No. 91-7729 (referred to as "the case"), knowingly made false material declarations.

  3. In the case, the Bank of the Brandywine Valley (the "Bank") sought to recover over $2.5 million which the Bank had advanced to defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" and related parties between October 23 and October 28, 1991, after ABUHOURAN deposited at the Bank checks totaling $2,410,000 which later proved to be worthless. In defense, ABUHOURAN insisted that he had deposited the checks in good faith, as those checks were the proceeds of a legitimate business transaction. He stated that he had sold goods located in the United States and in the Middle East; that the buyer of the goods sent payment to ABUHOURAN's broker, who deposited the funds in the broker's account at Provident Savings Bank in New Jersey; and that the broker had then written to ABUHOURAN the checks which ABUHOURAN

- 127 -

deposited at the Bank of the Brandywine Valley.  ABUHOURAN
further claimed that he and the persons who guaranteed repayment
of the money to the Bank -- defendants ADHAM ABUHOURAN, a/k/a
"Adam Houran," AKTHAM ABUHOURAN, a/k/a "Tony Houran," and ADMA
ABUHOURAN -- had then disbursed the funds and no longer had them
available.  It was therefore a matter material to the proceeding
to determine the facts regarding the deposit of the checks, the
supposed underlying business transaction, and the financial
status of the defendants.

4.  At the time and place stated in paragraph 1,
defendant HITHAM ABUHOURAN, a/k/a "Steve Houran," while under
oath, was questioned regarding the supposed deposit of checks by
his broker, defendant KASSEM ALAOUIE.  ABUHOURAN testified
regarding this material matter, at page 219 of the transcript:

> Q.   And did you observe who deposited that check and
>      how much was the check?
>
> A.   Kassem -- There was two checks, Your Honor: One
>      check for 975,000, one check for 1,450,000 --
>      1,475,000.  Two checks were deposited into the
>      bank.

In this testimony, ABUHOURAN represented that, in his presence,
KASSEM ALAOUIE deposited two checks at ALAOUIE's bank, Provident
Savings Bank, totaling $2,450,000.  This testimony was false, as
ABUHOURAN then knew.  In truth, ALAOUIE and ABUHOURAN presented
only one check to Provident for deposit, in the amount of
$975,000.

In violation of Title 18, United States Code, Section
1623.

- 128 -

## COUNT FIFTY

(Perjury)

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2. On January 28, 1992, at Philadelphia, in the Eastern District of Pennsylvania, defendant

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

while under oath as a witness in a proceeding ancillary to a case pending before the United States District Court for the district entitled The Bank of the Brandywine Valley v. Hitham Abuhouran, et al., No. 91-7729 (referred to as "the case"), that is, a deposition taken as part of the case, knowingly made false material declarations.

3. Paragraph 3 of Count 49 is incorporated here by reference, and sets forth the nature of the case.

4. At the time and place stated in paragraph 1, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" testified as follows at pages 250, 251, and 336 through 338 of the transcript:

Q. I would like you to turn to Exhibit 37, if you could, and turn to the same Schedule J -- well, first of all, confirm for me that Exhibit 37 is a copy of the Houran Construction Company Corporation income tax return for the 1987 fiscal year; is that correct?

A. Yes.

Q. And that is the fiscal year ending 7/31/88; is that correct?

A. Yes.

- 129 -

- - - - -

Q.    Could you turn to Exhibit 52, please, and could you confirm that this is a letter from Luis E. Crousillat to the stockholders of Houran Construction Company dated September 30, 1987, attached to a financial statement as of July 31st, 1987, which is three pages long; is that correct?

A.    Yes.

Q.    Did Mr. Crousillat prepare this financial statement?

A.    Yes.

Q.    Where did he get the information that he used to prepare this financial statement?

A     From my office.

Q     Did he physically come over to your office to get the information?

A     Yes, he did.

Q     And did he ask for documents and files?

A     Yes, he did.

Q     And did you provide those to him?

A     Yes.

Q     Okay.  Could you turn to Exhibit 53, please, and confirm that this is a letter from Louis Crousillat to the shareholders of blank with no date enclosing it looks like a 13 page financial statement?  Is that what this is?

A     Yes.

MR. SABEL:  Count the pages.

THE WITNESS:  13.

BY MR. ELLIS:  Did Mr. Crousillat prepare this financial statement?

A     Yes.

- 130 -

In this testimony, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" stated that the documents provided to the Bank which purported to be the 1987 tax return of Houran Construction Company ("HCC"), and the audited financial statements of HCC dated July 31, 1987 and July 31, 1989, were accurate.  He further stated that the financial statements were prepared by Luis Crousillat, an accountant.  All of this testimony was false, as the defendant then knew.  In truth, the financial statements in question were fictitious, and were not prepared by Crousillat (who is not an accountant), and the tax return was fictitious as well and was not the actual return filed by HCC for the year 1987.

In violation of Title 18, United States Code, Section 1623.

- 131 -

COUNT FIFTY-ONE

(Perjury)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   On January 5, 1992, at Philadelphia, in the Eastern District of Pennsylvania, defendant

AKTHAM ABUHOURAN,
a/k/a "Tony Houran,"

while under oath as a witness in a proceeding ancillary to a case pending before the United States District Court for the district entitled <u>The Bank of the Brandywine Valley v. Hitham Abuhouran, et al.</u>, No. 91-7729 (referred to as "the case"), that is, a deposition taken as part of the case, knowingly made false material declarations.

3.   Paragraph 3 of Count 49 is incorporated here by reference, and sets forth the nature of the case.

4.   At the time and place stated in paragraph 1, defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" testified falsely as follows, at pages 108 through 111 of the transcript:

Q.   What properties did Steve ask you to put up as your help to him?

A.   My three buildings that I mentioned earlier.

Q.   The three rental properties?

A.   Yes.

Q.   Anything else?

A.   That's all I have.

Q.   Did you own those properties free and clear of mortgages until that time?

A.   No.

Q.   They were encumbered by mortgages?

A.   Yes.

Q.   And what do you estimate to be the equity in those three properties above and beyond the encumbrances?

A.   I have no idea.

Q.   $10?

A.   Got to be more.

Q.   Okay.  Do you have an estimate of the value of those three properties?

A.   With the market today I can't figure how much is - - you know, the value.

- - - - -

Q.   Is it your testimony that you don't know whether the value of the three rental properties that you were asked to use as security was more than or less than the combined value of the mortgages?

Mr. SABEL:  Do you understand the question?

THE DEPONENT:  All I know is I cannot determine what the value of my properties are now, at this time.

BY MR. SCHER:  Was there a time in November of 1991 that you were able to?

A.   No.

Q.   Does anyone have an opinion with respect to the value of those properties, of which you are aware? Are you aware of anyone having an opinion as to the value of those properties?

A.   If you call appraiser.

Q.   Say again?

- 133 -

A.   If I had appraiser on the property he would give me market value.

Q.   Okay.  But you don't have an appraisal?

A.   No.

Q.   Are you aware of any current appraisal of those three rental properties?  Are you aware of one having been done?

A    No.

In this testimony, defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran" stated that at the request of defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" he pledged three rental properties he owned, located at 6313 Broadway, West New York, New Jersey; 520 7th Street, Union City, New Jersey; and 227 Martin Luther King, Jersey City, New Jersey, all to secure repayment of the $2.5 million taken from the Bank.  AKTHAM ABUHOURAN, a/k/a "Tony Houran" further testified that he did not know the equity value of these properties at the time he pledged them on November 15, 1991.  This testimony was false, as the defendant then knew.  In truth, AKTHAM ABUHOURAN, a/k/a "Tony Houran" knew that as of November 15, 1991 there was little if any equity value in the properties beyond the mortgages he owed which were secured by these properties.

        In violation of Title 18, United States Code, Section 1623.

<u>COUNT FIFTY-TWO</u>

(Perjury)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   On January 29, 1992, at Philadelphia, in the Eastern District of Pennsylvania, defendant

KASSEM ALAOUIE,

while under oath as a witness in a proceeding ancillary to a case pending before the United States District Court for the district entitled <u>The Bank of the Brandywine Valley v. Hitham Abuhouran,</u> <u>et al.</u>, No. 91-7729 (referred to as "the case"), that is, a deposition taken as part of the case, knowingly made false material declarations.

3.   Paragraph 3 of Count 49 is incorporated here by reference, and sets forth the nature of the case.

4.   At the time and place stated in paragraph 1, ALAOUIE testified as follows, at pages 119 through 123 of the transcript:

Q.   And you and Steve Houran walked into the bank?

A.   Yes.

- - - - -

Q.   And who did you meet with?

A.   Officer by the name of Maria.

- - - - -

Q.   Tell me about that conversation.

- 135 -

A.   I told her "I receive these two checks," okay -- I want to change testimony.  "I want to deposit the checks."  And I explain what happened with me on the other bank.

Q.   With Seth Gardner?

A.   Yes.  She took the check.

Q.   Both checks or --

A.   Both checks.

Q.   Okay.

A.   And she told me, "Okay, wait a minute."  She went inside to a room and come back and she told me "The correspondent bank for Globe is Manufacturers Hanover.  So let's call Manufacturers Hanover and find out how long is going to take to clear this fund."

Q.   Okay.

A.   Because she did not deposit the, you know, like, she did not let me put it as a deposit.

Q.   She just had the checks and she was making a call --

A.   Yes.

Q.   -- to get some information?

A.   Yes.

Q.   Were you present when she called Manufacturers Hanover?

A.   Yes.

Q.   So you heard her part of the conversation?

A.   Yes.

- - - - -

Q.   What did she say?

A.   He ask her question, I guess, and she start to give him whatever written on the checks, numbers and whatever.  And she hang up, she tell me, "No,

- 136 -

you don't need no five week, no six week.  This is
a bank check.  If we send it over tonight you
going to have the money wire to your account
tomorrow."

Q.    Well, did you understand that you were depositing
the checks into your account?

A.    Yes.

Q.    And then what did you do?

A.    I left.

Q.    Did you leave the checks with Maria?

A.    Yes.

Q.    Both checks?

A.    Both checks.

Q.    Did you fill out a deposit slip?

A.    No.  She didn't let me fill deposit slip.

Q.    Did you ask her to?

A.    No.  She give me paper, receipt.

Q.    A receipt for the two checks?

A.    Yes.

Q.    Do you have that receipt?

A.    No, I don't have it.

Q.    Do you know where it is?

A.    No.

Q.    When was the last time you saw it?

A.    Was in my pocket and I, I misplace it.

Q.    Was it a carbon copy of something? In other words
was it a multi --

A.    No.  Regular white paper.

Q.    And what did it say?

- 137 -

A.    It said, "Receive from Kassem Alaouie the amount
of two check, for 975 and 1,450 for collection."

In this testimony, KASSEM ALAOUIE testified that he deposited two

checks, totaling $2,425,000, in his account at Provident Savings

Bank, which represented the proceeds of a sale in which he acted

as the broker on behalf of defendant HITHAM ABUHOURAN, a/k/a

"Steve Houran." ALAOUIE further testified that a representative

of Provident accepted both checks.  This testimony was false, as

defendant KASSEM ALAOUIE then knew.  In truth, he attempted to

deposit only one check, in an amount of $975,000.

In violation of Title 18, United States Code, Section

1623.

- 138 -

<u>COUNT FIFTY-THREE</u>

(Perjury)

THE GRAND JURY FURTHER CHARGES THAT:

1.   Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.   On January 30, 1992, at Englewood, New Jersey, defendant

ADHAM ABUHOURAN,
a/k/a "Adam Houran,"

while under oath as a witness in a proceeding ancillary to a case pending before the United States District Court for the Eastern District of Pennsylvania entitled <u>The Bank of the Brandywine Valley v. Hitham Abuhouran, et al.</u>, No. 91-7729 (referred to as "the case"), that is, a deposition taken as part of the case, knowingly made false material declarations.

3.   Paragraph 3 of Count 49 is incorporated here by reference, and sets forth the nature of the case.

4.   At the time and place stated in paragraph 1, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran" testified at pages 144 and 154 of the transcript as follows:

Q.   Would you take a look at the pages which are behind tab 30 and tell me whether you've ever seen them before?

A.   Yes.

Q.   You have seen it before?

A.   (Witness nodded).

Q.   Is that a true and correct copy of your 1988 United States tax return?

A.   Yes.

- - - - -

Q.   Let me show you the document behind tab 31 of
     Houran 2, which purports to be a copy of your 1989
     US individual income tax return, form 1040, and
     I'll just show you that, which is also unsigned by
     the taxpayer.  Would you take a look at this
     document and tell me whether you recognize it?

A.   Yes, I remember.

Q.   Is that a true and correct copy of your 1989 tax
     return which you filed with the United States
     Government?

A.   To the best of my knowledge, yes.

In this testimony, defendant ADHAM ABUHOURAN, a/k/a "Adam Houran"

represented that the documents provided to the Bank which

purported to be his 1988 and 1989 personal tax returns were the

authentic returns filed with the Internal Revenue Service for the

years in question.  This testimony was false, as the defendant

then knew.  The documents provided to the Bank were fictitious,

and claimed income for those years in excess of the amounts ADHAM

ABUHOURAN, a/k/a "Adam Houran" reported to the IRS.

          In violation of Title 18, United States Code, Section

1623.

## COUNT FIFTY-FOUR

(Conspiracy to Commit Money Laundering
-- Theft of Over $2.5 Million)

THE GRAND JURY FURTHER CHARGES THAT:

1.  The first paragraph of Count One of this Indictment is incorporated here by reference.

2.  From on or about October 22, 1991, to on or about February 26, 1992, in the Eastern District of Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran," and

AKTHAM ABUHOURAN,
a/k/a "Tony Houran"

did knowingly and willfully combine, conspire, confederate, and agree, together and with each other, and with other persons known and unknown to the grand jury, to commit the following offenses against the United States:

-- to engage in money laundering, that is, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct such a financial transaction with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1); and

-- to transport and cause to be transported in interstate commerce from West Chester, Pennsylvania to locations outside the Commonwealth of Pennsylvania money which was taken by

- 141 -

fraud, in violation of Title 18, United States Code, Section 2314.

### Manner and Means

3.  It was part of the conspiracy that the defendants, after committing the bank fraud described in Count 47 of this Indictment, aimed to accomplish the purpose of the fraud, which was to steal funds of the Bank and convert them to the use of themselves and their companies.  To accomplish this goal, the defendants engaged in scores of transfers of funds beginning on October 22, 1991, as they removed from the Bank the ill-gotten money and diverted it to the use of themselves and their companies.

### Overt Acts

In furtherance of the conspiracy and to achieve its objects, defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," and AKTHAM ABUHOURAN, a/k/a "Tony Houran" (collectively the "defendants"), and other persons known and unknown to the grand jury, committed the following overt acts, among others, within the Eastern District of Pennsylvania and elsewhere:

1.  Of the $2,410,000 deposited in the account of Houran Trading Company, $1,360,000 was transferred by the defendants to the account at the Bank of Houran Construction Company ("HCC"), as follows:

- 142 -

a.  HITHAM ABUHOURAN, a/k/a "Steve Houran" wrote check number 1016, dated October 24, 1991, in the amount of $560,000, payable to HCC.

b.  HITHAM ABUHOURAN, a/k/a "Steve Houran" wrote check number 1022, dated October 24, 1991, in the amount of $600,000, payable to HCC.

c.  HITHAM ABUHOURAN, a/k/a "Steve Houran" requested that the Bank transfer an additional $200,000 to the HCC account.

2.  From the HCC account at the Bank, ADHAM ABUHOURAN, a/k/a "Adam Houran" wrote the following checks, using the funds transferred from the Houran Trading account:

a.  Number 3193, dated October 22, 1991, payable to Raymond E. Murphy, Jr., Esq., in the amount of $142,000.  This check was deposited in Murphy's account at First Fidelity Bank, Jersey City, New Jersey ("First Fidelity"), and he in turn wrote checks to Cahn, Wishod, Wishod & Lamb, Melville, New York, one dated November 5, 1991 in the amount of $135,000, and one dated November 21, 1991 in the amount of $6,500, both to pay a personal debt of the defendants.

b.  Checks dated October 22, 1991, payable to Petra Construction, Inc., and deposited in Petra's accounts at First Fidelity:

(1)  Number 3196, in the amount of $9,000.

(2)  Number 3197, in the amount of $11,000.

(3)  Number 3198, in the amount of $13,000.

(4)   Number 3199, in the amount of $14,000.

(5)   Number 3200, in the amount of $10,000.

c.   Check number 3206, dated October 22, 1991, payable to Community Const. Co. in the amount of $195,000, and deposited in the Community Construction account at First Fidelity.  These funds were disbursed from the Community Construction account in a check, number 9988, dated October 30, 1991, in the amount of $210,000, written by ADHAM ABUHOURAN, a/k/a "Adam Houran," payable to Houran Const. Co. Inc. and deposited at United Jersey Bank, Union City, New Jersey ("United Jersey").  The funds were then used for a payment by HCC to Pre-Structured Building Systems, Inc. and Butler Manufacturing Co., in the amount of $190,000, on or about October 31, 1991.

d.   Check number 3207, dated October 23, 1991, payable to Diversified Carpentry in the amount of $25,000, and deposited at First Fidelity.  On or about October 30, 1991, ADHAM ABUHOURAN, a/k/a "Adam Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran" prepared checks on the Diversified account returning $14,000 to HCC and diverting $10,000 to another HCC subsidiary, Environmental Contracting Services Corporation.

e.   Check number 3208, dated October 23, 1991, payable to Masonry Construction Corp. in the amount of $25,000, and deposited at First Fidelity.

f.   Check number 3209, dated October 23, 1991, payable to Environmental Services Contracting Corp. in the amount of $15,000, and deposited at First Fidelity.

4.   From the $2,410,000 deposited in the Houran Trading
Company account, HITHAM ABUHOURAN, a/k/a "Steve Houran" wrote a
check to himself, number 1017, on or about October 22, 1991, in
the amount of $10,000.   He deposited this check in his personal
account at First Fidelity.   In addition, from the Houran Trading
funds, he wrote another check to himself, number 1023, dated
October 24, 1991, in the amount of $275,000, which he deposited
in his personal account at the Bank.   He then wrote the following
checks on his account at the Bank, among others, using these
funds:

          a.   Number 1014, dated on or about October 22,
1991, payable to American Express in the amount of $7,000.

          b.   Number 1015, dated October 22, 1991, payable
to Chemical Bank in the amount of $2,500.

          c.   Number 1016, dated October 22, 1991, payable
to First Fidelity Bank in the amount of $10,000.

          d.   Number 1017, dated October 22, 1991, payable
to Citibank in the amount of $2,000.

          e.   Number 1018, dated October 22, 1991, payable
to MBNA in the amount of $8,700.

          f.   Number 1019, dated October 22, 1991, payable
to CoreStates Bank of Delaware in the amount of $4,831.

          g.   Number 1020, dated October 22, 1991, payable
to Citibank in the amount of $5,488.

          h.   Number 1021, dated October 23, 1991, payable
to National Credit Group in the amount of $27,850.

$50,000, and deposited at First Fidelity.  From that account, ADHAM ABUHOURAN, a/k/a "Adam Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran" wrote numerous checks between on or about October 23 and on or about October 30, 1991, to pay debts of Petra and HCC.

        k.  Check number 3217, dated October 23, 1991, payable to Houran Const. Co., Inc. in the amount of $100,000, and deposited in HCC's account at First Fidelity.  From that account, ADHAM ABUHOURAN, a/k/a "Adam Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran" wrote dozens of checks on or about October 23 and October 24, 1991 to pay debts owed by HCC.

        3.  Also from the HCC account at the Bank, HITHAM ABUHOURAN, a/k/a "Steve Houran" requested the following wire transfers of funds to accounts at First Fidelity on or about October 25, 1991:

        a.  $10,000 to Diversified Carpentry.  These funds were returned to HCC in a check, number 1031, prepared on or about October 30, 1991 by ADHAM ABUHOURAN, a/k/a "Adam Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran."

        b.  $20,000 to Masonry Construction.  These funds were returned to HCC in a check, number 1052, in the amount of $25,000, prepared on or about October 30, 1991 by ADHAM ABUHOURAN, a/k/a "Adam Houran" and AKTHAM ABUHOURAN, a/k/a "Tony Houran."

        c.  $20,000 to Sunrise Aluminum.

        d.  $15,000 to the HCC payroll account.

i. Number 1022, dated on or about October 23, 1991, payable to Schuyler Savings in the amount of $3,376.33.

j. Number 1023, dated on or about October 23, 1991, payable to Schuyler Savings in the amount of $3,521.06.

k. Number 1024, dated October 23, 1991, payable to Washington Savings Bank in the amount of $2,279.13.

l. Number 1025, dated October 22, 1991, payable to Washington Savings Bank in the amount of $2,279.13.

m. Number 1026, dated October 22, 1991, payable to Washington Savings Bank in the amount of $1,732.98.

n. Number 1027, dated on or about October 22, 1991, payable to Washington Savings Bank in the amount of $4,326.80.

o. Number 1028, dated October 22, 1991, payable to Hitham Abuhouran in the amount of $22,000. HITHAM ABUHOURAN, a/k/a "Steve Houran" deposited these funds in an account at Merrill Lynch, and then used them for personal expenses over the next three months.

p. Number 1029, dated October 24, 1991, payable to Mobil in the amount of $150.

q. Number 1062, dated October 26, 1991, payable to TTM Asso. in the amount of $40,000.

HITHAM ABUHOURAN, a/k/a "Steve Houran" also requested the following cashier's checks, using funds from his account at the Bank:

a.  Bank check number 5447, dated October 25, 1991, payable to Boardwalk Regency in the amount of $35,000. This check was cashed by HITHAM ABUHOURAN, a/k/a "Steve Houran" at the cashier's window of Caesars Hotel in Atlantic City, New Jersey on the evening of October 24, 1991.

b.  Bank check number 5448, dated October 25, 1991, payable to T & M Asso. in the amount of $40,000.  This check was deposited by HITHAM ABUHOURAN, a/k/a "Steve Houran" in his personal account at First Fidelity.

5.  From the $2,410,000 deposited in the Houran Trading Company account at the Bank, $675,000 was transferred to Houran Trading's account at First Fidelity, through the following checks written by HITHAM ABUHOURAN, a/k/a "Steve Houran":  Number 1014, dated October 25, 1991, in the amount of $400,000; and number 1021, dated October 24, 1991, in the amount of $275,000.  From the Houran Trading account at First Fidelity, ADHAM ABUHOURAN, a/k/a "Adam Houran" wrote the following checks:

a.  Number 9988, dated October 24, 1991, payable to Hitham J. Abuhouran in the amount of $100,000.  HITHAM ABUHOURAN, a/k/a "Steve Houran" deposited this check in an account at Washington Savings Bank, Hoboken, New Jersey, where it covered a check he had earlier written in the same amount to HCC.

b.  Number 9989, dated October 25, 1991, in the amount of $500,000, payable to First Fidelity.  This check was deposited in a new account of Houran Trading at National Westminster Bank, West New York, New Jersey.  The funds were

- 149 -

returned to HCC from that account, in three checks written by HITHAM ABUHOURAN, a/k/a "Steve Houran" and ADHAM ABUHOURAN, a/k/a "Adam Houran":  Number 1001, dated November 12, 1991, in the amount of $200,000; number 1002, dated December 4, 1991, in the amount of $200,000; and number 1003, dated December 16, 1991, in the amount of $100,000.

       c.  Number 1001, dated October 30, 1991, payable to Houran Const. Co., Inc. in the amount of $100,000.  This check was deposited by HCC in its account at United Jersey.

      6.  From the $2,410,000 deposited in the Houran Trading Company account at the Bank, $55,000 was given to defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran," through check number 1018, dated October 23, 1991.  The check, written by HITHAM ABUHOURAN, a/k/a "Steve Houran," was deposited by AKTHAM ABUHOURAN, a/k/a "Tony Houran" in his account at First Fidelity.  From that account, AKTHAM ABUHOURAN, a/k/a "Tony Houran" wrote a check to himself for $25,000, dated October 31, 1991, and deposited it to open a new account at Citizens First.  From the Citizens First account, he moved the funds to HCC, as part of a check totaling $150,000 he wrote to himself from the Citizens First account on or about December 16, 1991 and deposited in HCC's account at First Fidelity.

      7.  From the $2,410,000 deposited in the Houran Trading Company account at the Bank, the defendants distributed $150,000 to Izdehar Abuhouran, the wife of defendant AKTHAM ABUHOURAN, a/k/a "Tony Houran."  The money was distributed in a cashier's

- 150 -

check dated October 28, 1991 requested by the defendants, payable
to "Izdhar N. Hattar," which is Izdehar Abuhouran's maiden name.
The defendants deposited the check in a new account at National
Community Bank, Ridgefield, New Jersey.  From that account,
Izdehar Abuhouran wrote a check, number 001, dated October 31,
1991, payable to Aktham Abuhouran in the amount of $150,000.
AKTHAM ABUHOURAN, a/k/a "Tony Houran" deposited this check in a
new account at Citizens First.  Ultimately, he returned $25,000
to the Izdhar Hattar account at NCB on or about November 6, 1991,
where it remained until Izdehar Abuhouran wrote a check to Petra
Construction for $25,000 on or about February 26, 1992, and Petra
deposited the funds in its account at United Jersey.  The
remaining $125,000 in the Citizens First account which came from
the Izdhar N. Hattar cashier's check was delivered to HCC, as
part of a check totaling $150,000 which AKTHAM ABUHOURAN, a/k/a
"Tony Houran" wrote to himself from the Citizens First account on
or about December 16, 1991 and deposited in HCC's account at
First Fidelity.

     All in violation of Title 18, United States Code,
Section 371.

COUNT FIFTY-FIVE

(Misapplication -- Theft of Over $2.5 Million)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment is incorporated here by reference.

2.  Between on or about October 23, 1991 and on or about October 28, 1991, at West Chester, in the Eastern District of Pennsylvania, defendant

SETH T. GARDNER

willfully, and with intent to injure and defraud the Bank of the Brandywine Valley, misapplied funds and monies of the Bank, and funds and monies entrusted to the custody or care of the Bank, by permitting the withdrawal from the Bank of uncollected funds in the amount of $2,527,812.15.

3.  This conduct represented misapplication of funds for the following reasons, among others:

a.  GARDNER, as President of the Bank, created no controls or oversight of the disbursement of uncollected funds, that is, allowing customers to withdraw from the Bank funds which had been deposited by checks which had not yet cleared.  For this reason, defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" was able to deposit checks totaling $975,000 on October 23, 1991, $825,000 on October 24, 1991, and $610,000 on October 25, 1991, and on each day withdraw from the Bank virtually the same amount which was deposited.

- 152 -

b.  GARDNER personally assisted ABUHOURAN in the withdrawal of large amounts of uncollected funds, by a series of actions which included the following:

(1) certifying a check written on the account at the Bank of Houran Construction Company, on or about October 23, 1991, payable to Community Const. Co., in the amount of $195,000;

(2) writing a cashier's check on the Bank's account, on or about October 24, 1991, payable to Boardwalk Regency, in the amount of $35,000;

(3) writing a cashier's check on the Bank's account, on or about October 25, 1991, payable to T & M Associates, in the amount of $40,000; and

(4) authorizing four wire transfers totaling $65,000 from the depository account of Houran Construction Company on October 25, 1991.

None of these transactions was possible without GARDNER's decision to allow access to uncollected funds deposited by ABUHOURAN between October 23 and 25, 1991.

In violation of Title 18, United States Code, Section 656.

- 153 -

COUNT FIFTY-SIX

(Continuing Financial Crimes Enterprise)

THE GRAND JURY FURTHER CHARGES THAT:

1.  The first paragraph of Count One is incorporated here by reference.

2.  From in or about May 1990, to in or about February 1992, in the Eastern District of Pennsylvania and elsewhere, defendant

HITHAM ABUHOURAN,
a/k/a "Steve Houran"

did knowingly conduct a continuing financial crimes enterprise in that:

(a)  he committed a series of violations of Section 1344 of Title 18 of the United States Code, that is, the violations charged in Counts 1, 3, 5, 7, 10, 12, 14, 16, 20, 22, 24, 26, 29, 33, and 47 of this Indictment;

(b)  the series of violations described in subparagraph (a) was undertaken by defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" in concert with three or more other persons, known and unknown to the grand jury, with respect to whom defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" occupied a position of organizer, supervisor, and manager; and

(c)  defendant HITHAM ABUHOURAN, a/k/a "Steve Houran" received more than $5,000,000 in gross receipts from the violations described in subparagraphs (a) and (b), that is, a total of approximately $9,353,812.15, during the time period recited above.

- 154 -

In violation of Title 18, United States Code, Section
225.

<u>COUNT FIFTY-SEVEN</u>

(Forfeiture)

THE GRAND JURY FURTHER CHARGES THAT:

As a result of the violations of Title 18, United States Code, Sections 1344 and 1956, as set forth in Counts 1, 3, 5, 7, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 27, 29, 31, 33, and 47 of this Indictment, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran,"

ADHAM ABUHOURAN,
a/k/a "Adam Houran,"

AKTHAM ABUHOURAN,
a/k/a "Tony Houran," and

ADMA ABUHOURAN

shall jointly and severally forfeit to the United States pursuant to Title 18, United States Code, Section 982(a):

1.   All property, real and personal, which was involved in the commission of these violations and all property traceable to such property, including but not limited to the following:  A sum of cash in the amount of $9,353,812.15.

2.   All property constituting and derived from proceeds defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," AKTHAM ABUHOURAN, a/k/a "Tony Houran," and ADMA ABUHOURAN obtained, directly or indirectly, as a result of these violations, including but not limited to the following properties:

a.   All of the premises located at 338 Orangeburgh Road, in the Borough of Old Tappan, in the County of Bergen, in

- 156 -

the State of New Jersey, known as Lot 5, Block 301 on the tax assessment map of the municipality, and more particularly described at Book 7021, Page 357 of the records of the Clerk of Bergen County.

       b.  All of the premises located at 31 Wildwood Road, in the Borough of Saddle River, in the County of Bergen, in the State of New Jersey, known as Lot 1, Block 1303 on the tax assessment map of the municipality, and more particularly described at Book 7488, Page 940 of the records of the Clerk of Bergen County.

Substitute Assets

       If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants HITHAM ABUHOURAN, a/k/a "Steve Houran," ADHAM ABUHOURAN, a/k/a "Adam Houran," AKTHAM ABUHOURAN, a/k/a "Tony Houran," and ADMA ABUHOURAN,

       a.  cannot be located upon the exercise of due diligence;

       b.  has been transferred or sold to, or deposited with, a third party;

       c.  has been placed beyond the jurisdiction of the Court;

       d.  has been substantially diminished in value; or

       e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 18,
United States Code, Section 982(b)(1), to seek forfeiture of any
other property of said defendants up to the value of the above
forfeitable property.

All pursuant to Title 18, United States Code, Sections
982(a)(1), 982(a)(2), and 982(b)(1).

A TRUE BILL:

_____
FOREPERSON


_____
MICHAEL R. STILES
United States Attorney

No. _____

# UNITED STATES DISTRICT COURT

*Eastern District of Pennsylvania*

CRIMINAL  *Division*

THE UNITED STATES OF AMERICA

vs.

HITHAM ABUHOURAN, a/k/a "Steve Houran", et al

# INDICTMENT

18 U.S.C. § 225 (Conducting a continuing financial crimes enterprise -- 1 Count)
18 U.S.C. § 371 (Conspiracy -- 2 Counts)
18 U.S.C. § 656 (Misapplication of bank funds -- 16 Counts)
18 U.S.C. § 982 (Forfeiture -- 1 Count)
18 U.S.C. § 1005 (False entries in bank records -- 11 Counts)
18 U.S.C. § 1344 (Bank fraud -- 15 Counts)
18 U.S.C. § 1623 (Perjury -- 5 Counts)
18 U.S.C. § 1956 (Money laundering -- 4 Counts)
18 U.S.C. § 2314 (Interstate transportation of property obtained by fraud -- 2 Counts)
18 U.S.C. § 2 (Aiding and abetting)

*A true bill.*

_____
Foreman

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 19* _____

_____
Clerk

*Bail, $* _____